917 P.2d 766

**ROSEBUD ENTERPRISES, INC., Complainant–Appellant–Cross Respondent,**

v.

**IDAHO PUBLIC UTILITIES COMMISSION, Respondent–Cross Respondent,**

and

**PacifiCorp, dba Utah Power & Light Company, Respondent–Cross Appellant.**

No. 21964.

Supreme Court of Idaho.
Boise, December 1995 Term.

May 30, 1996.

Orndorff & Trout, Boise, for appellant. Owen H. Orndorff argued.

Alan G. Lance, Attorney General; Scott D. Woodbury, Deputy Attorney General (argued), Boise, for Idaho Public Utilities Commission. Stoel, Rives, Boley, Jones and Grey, Portland, OR, for PacifiCorp. James F. Fell argued.

SCHROEDER, Justice.

This is an appeal by Rosebud Enterprises, Inc. (Rosebud) from those portions of Idaho Public Utilities Commission (IPUC) Orders No. 25870 and 25922 which approved Pacifi-Corp's proposed adjustments to the base avoided cost rate for the purchase of electric capacity and energy from Rosebud's pro-

posed electric generating facility. Rosebud also requests an award of attorney fees, witness fees, expenses and costs pursuant to section 12–117 of the Idaho Code and Idaho Appellate Rule 40. PacifiCorp cross-appeals those portions of Orders No. 25870 and 25922 in which the IPUC granted Rosebud "grandfathered" status for calculating rates for firm capacity and energy based on the established methodology in place before January 14, 1994.

## I.

## BACKGROUND AND PRIOR PROCEEDINGS

### A. The Parties

Rosebud is the developer of a small power production plant which is classified as a "qualifying facility" (QF) under the Public Utility Regulatory Policies Act of 1978 (PURPA). Pub.L. No. 95–617, 92 Stat. 3117 (1978). *See* PURPA §§ 201, 210; 18 C.F.R. §§ 292.203(a), .204 (1994). Rosebud proposes to develop a 40 megawatt (MW) electric generating facility near Montpelier, Idaho, that will burn high sulphur, waste petroleum coke. Rosebud proposes to sell the electrical output of the Montpelier facility to PacifiCorp, an Oregon-based electric corporation doing business in eastern Idaho as Utah Power and Light.

As a public utility operating in Idaho, PacifiCorp is subject to state regulation under Idaho's Public Utilities Law. I.C. §§ 61–104, –119, and –129 (1994). PacifiCorp is also a state regulated utility within the meaning of PURPA. *See* PURPA §§ 3(4), (17), and (18); 16 U.S.C.A. § 2602(4), (17), (18) (West 1985).

The IPUC has regulatory authority over PacifiCorp pursuant to the Idaho Public Utilities Law and PURPA. *See* I.C. § 61–501 – 540 (1994); PURPA, §§ 3(16), (17); 16 U.S.C.A. § 796(15), (21) (1985). The IPUC has authority under PURPA and implementing regulations of the Federal Energy Regulatory Commission (FERC) to set "avoided

costs,"[1] to order electric utilities to purchase power from small power producers, and to implement FERC rules. PURPA §§ 210, 210(a), and 210(f); 16 U.S.C.A. § 824a–3(a), (f) (West 1985 & Supp.1995); *See also, Afton Energy, Inc. v. Idaho Power Co.,* 107 Idaho 781, 693 P.2d 427 (1984).

### B. The Rules

#### 1. Federal

■ Congress passed PURPA in 1978 in response to the prevailing energy crisis. Its purpose was to encourage the promotion and development of renewable energy technologies as alternatives to fossil fuels and the construction of new generating facilities by electric utilities. Section 210 of PURPA requires that electric utilities offer to purchase power produced by cogenerators or small power producers that obtain qualifying facility (QF) status under section 201. 16 U.S.C. § 824a–3(a)(2). However, under PURPA section 210(b) the rate to be paid for such power is not to exceed the "incremental cost to the utility of alternative electric energy." *Id.* at § 824a–3(b), (d).

The Federal Energy Regulatory Commission (FERC) promulgated rules implementing sections 201 and 210 of PURPA. Under these rules the rate a qualifying facility is to receive for the sale of its power is generally referred to as the "avoided cost" rate. Qualifying facilities have the option of selling power to a utility based on the utility's avoided costs at the time of delivery or at the time the qualifying facility's legally enforceable obligation to deliver power is incurred. 18 C.F.R. § 292.304(d) (1995). PURPA and related FERC regulations provide that the rates for qualifying facilities shall: (1) be just and reasonable to the electric utility's consumers and in the public interest; and (2) not discriminate against qualifying cogenerators or small power producers. 16 U.S.C. § 824a–3(b); 18 C.F.R. § 292.304(a)(1), (2) (1995). Thus, a balance must be struck between the local public interest of a utility's electric consumers and the national public

---

1. Avoided costs are those costs which a public utility would otherwise incur for electric energy and/or capacity, either purchasing from another source or through its own production. 18 C.F.R. § 292.101(b)(6) (1995).

interest in development of alternative energy sources.

■ In determining avoided costs, FERC rules require that, to the extent practicable, the availability of capacity or energy from a qualifying facility during a utility's daily and seasonal peak periods be considered, including:

(i) The ability of the utility to dispatch [2] the qualifying facility;

(ii) The expected or demonstrated reliability of the qualifying facility;

(iii) The terms of any contract or other legally enforceable obligation, including the duration of the obligation, termination notice requirement and sanctions for non-compliance;

(iv) The extent to which scheduled outages of the qualifying facility can be usefully coordinated with scheduled outages of the utility's facilities;

(v) The usefulness of energy and capacity supplied from a qualifying facility during system emergencies, including its ability to separate its load from its generation;

(vi) The individual and aggregate value of energy and capacity from qualifying facilities on the electric utility's system; and

(vii) The smaller capacity increments and the shorter lead times available with additions of capacity from qualifying facilities; and

(3) The relationship of the availability of energy or capacity from the qualifying facility as derived in paragraph (e)(2) of this section, to the ability of the electric utility to avoid costs, including the deferral of capacity additions and the reduction of fossil fuel use; and

(4) The costs or savings resulting from variations in line losses from those that would have existed in the absence of purchases from a qualifying facility, if the

purchasing electric utility generated an equivalent amount of energy itself or purchased an equivalent amount of electric energy or capacity.

18 C.F.R. § 292.304(e). The IPUC has specifically recognized that these factors "may be of particular importance when negotiating with extremely large suppliers." IPUC Order No. 15746.

Although FERC promulgated the general scheme and rules, it left implementation of PURPA to state regulatory authorities. FERC provides no precise formula for calculating a utility's avoided costs; however, there are two general caveats governing state regulatory agencies' implementation of PURPA: (1) electric utilities are not required to pay more than their established avoided costs for power purchases from qualifying facilities; and (2) cogenerators and small power producers are not to be subjected to pervasive, utility-type regulation in their sales to electric utilities. PURPA section 210(2), 16 U.S.C. § 824a–3(b), (e); 18 C.F.R. § 292.602(c)(1)(i)(ii) (1995).

### 2. IPUC Rules

IPUC Order No. 15746 sets out the general principles and framework under which Idaho electric utilities are to purchase power from qualifying facilities. Pursuant to FERC rules, published or standard avoided cost rates are required only for small qualifying facilities with a design capacity of 100 kilowatts(kW) or less. 18 C.F.R. § 292.304(c). In its discretion, the IPUC had set the design capacity limit for published rates at a higher 10 megawatt threshold at the time this matter arose.[3] Thus, Rosebud's proposed 40 megawatt Montpelier facility does not qualify for PacifiCorp's standard, published avoided cost rate. Rather, the IPUC requires that rates and contracts for larger facilities such as Rosebud's be individually negotiated, with a utility's published or filed avoided cost rates used as a starting point for negotiations. Individualized consid-

---

2. "Ability to dispatch" refers to a utility's ability to control a resource's output, including the ability to turn the plant "on" and "off" at the dispatcher's discretion based on consumer power demands and the seasonal availability of more cost-effective power such as hydroelectric.

3. One "megawatt" or "MW" is equal to 1,000 kilowatts, or 1 million watts.

eration is to be given to such issues as line losses, reliability, and the purchasing utility's scheduling ability, and to a project's effect on a utility's load resource balance. IPUC Orders No. 15746, 22636. The IPUC list of possible negotiated adjustments is not exclusive. It is the responsibility of the utility and the qualifying facility to determine the appropriateness of any proffered adjustments. IPUC Order No. 20859. A special hearing for IPUC approval of negotiated rates is required.

■ IPUC's standards and requirements for implementation of PURPA are set out in its body of decisions arising from generic, rate-setting, and complaint actions. The IPUC possesses the authority and jurisdiction to engage in this case-by-case analysis pursuant to sections 61–501 to 503, section 61–129, and section 61–612 of the Idaho Code. *Empire Lumber Co. v. Washington Water Power Co.,* 114 Idaho 191, 192, 755 P.2d 1229, 1230 (1987), *cert. denied,* 488 U.S. 892, 109 S.Ct. 228, 102 L.Ed.2d 218 (1988). Because each case presents a myriad of facts that distinguish it, no one case represents the law by which subsequent parties are bound. Thus, all case decisions issued by the IPUC are potentially applicable to, and may have an impact on, a qualifying facility's project. IPUC Order No. 20859.

### a. Published avoided cost rates for small qualifying facilities

■ The published rates for small qualifying facilities relevant to this case were based on the costs associated with a hypothetical coal-fired steam generation plant located in the Powder River Basin of eastern Wyoming. This hypothetical power resource is called a Surrogate Avoided Resource (SAR). IPUC Order No. 22636. A surrogate resource is used to estimate the avoid-

ed-cost value of "energy" and "capacity." [4] The methodology used for determining avoided cost rates for small qualifying facilities in Idaho is commonly referred to as the "SAR methodology." At the time Rosebud filed its complaint, the published rates for PacifiCorp for qualifying facilities of 10 MW or less were established in IPUC Order No. 24383.

### C. The Complaint and Subsequent Actions Leading Up to the Hearing

On November 13, 1992, Rosebud filed a Complaint with the IPUC seeking an order directing PacifiCorp to purchase capacity and energy "pursuant to terms and conditions of Idaho law and at prices per kilowatt hour as calculated pursuant to the Idaho Public Utilities Commission" from its proposed 40 MW electric generating facility to be located near Arco, Idaho. Rosebud represented in its Complaint and attached correspondence that it was "ready, willing, and able" to sign a contract for deliveries commencing in 1996. Rosebud also alleged that PacifiCorp was refusing to negotiate or provide any avoided cost rates.

In its Answer, PacifiCorp noted that less than two months had elapsed between receipt of Rosebud's first communication regarding its proposed project and the filing of Rosebud's Complaint. PacifiCorp alleged Rosebud had not provided requested information. PacifiCorp included a copy of a letter to Rosebud in which PacifiCorp explained that in negotiating a purchase price it must consider the amount of transmission capacity available under its transmission service agreement with Idaho Power Company for moving power produced in the eastern part of the state to the western part of its system, because transmission capacity limitations would affect the avoidable costs associ-

---

4. To evaluate and compare the costs and benefits of individual generating facilities, the total costs of a generating facility are sometimes segregated into two main categories: "capacity" and "energy". The capital costs of a generating facility are generally allocated to capacity. Capital costs generally include costs of constructing and installing generating equipment and the financial carrying costs associated with a capital investment in a generating facility. Once incurred, these investment costs are assumed to be "fixed"

and will not vary with changes in the actual amount of generation.

Costs allocated to "energy" are the costs generally associated with the variable costs of operating, maintaining and fueling a generating facility. Energy costs vary based on actual generation.

PacifiCorp's published avoided cost rates in effect prior to January 14, 1994, are based on an avoided "energy only" rate for all kilowatts of firm energy produced. IPUC Order No. 22636.

ated with a large generation project such as Rosebud's.

A prehearing conference was held on January 20, 1993. Rosebud stated that it was seeking an avoided cost rate consistent with the rates and methodology contained in Orders No. 23358 and 24383; that it was attempting to determine the viability of its proposed project; and, that it was too early for a contract. Subsequent to the initial prehearing conference, the IPUC issued a Notice of Scheduling. In its notice, the IPUC stated:

It is anticipated that the parties will be able to agree to a set of reasonable assumptions (e.g., firmness and reliability of fuel supply) on which [PacifiCorp] can base and calculate an energy and capacity value for the proposed generated power. It is the understanding of the Commission that Rosebud is not seeking a contract or a lock-in of a firm rate at this time, merely a reasonable estimated rate which it can then use to ascertain project viability.

On April 15, 1993, Rosebud notified the IPUC and PacifiCorp that it had changed the location of its project from Arco to Montpelier, Idaho. The location change was necessitated by the discovery in February of 1993 that the Lost River substation near Arco is not a point of interconnection with PacifiCorp's 230 kV transmission system. Thus, Rosebud would incur an additional expense in getting its power to the 230 kV transmission line if the project site remained in Arco.

A second prehearing conference was convened on September 2, 1993, because of what Rosebud perceived to be an impasse in negotiations. PacifiCorp stated that it provided Rosebud with a set of avoided cost values based on certain assumptions for Rosebud to use to determine project feasibility, not as a firm offer. Rosebud responded that it needed a firm commitment from PacifiCorp as to the available rates in order to assess viability. The IPUC then directed PacifiCorp to "identify in writing as precisely as possible the type of information that Rosebud must

provide in order for negotiation to proceed further."

On December 17, 1993, PacifiCorp filed an application with the IPUC in another case requesting a revision of its published avoided cost rates for qualifying facilities producing 10 megawatts or less. On January 14, 1994, the IPUC terminated the availability of PacifiCorp's avoided costs and declared that qualifying facilities that did not have contracts, or could not demonstrate entitlement to a contract as of that date, would be subject to the final avoided costs established in PacifiCorp's application. IPUC Order No. 25361.

By May of 1994 the parties, with the IPUC's approval, agreed to continue contract and rate negotiations along the lines of the procedures set out by the IPUC in *Rosebud Enterprises, Inc. v. Idaho Power Co.*, IPUC Order No. 25454, 1994 WL 232391 (Idaho 1994). On July 11, 1994, PacifiCorp filed its "proposed pricing" for the purchase of Rosebud generation. PacifiCorp qualified its proposal accordingly:

[T]his proposal contains prices based upon PacifiCorp's superseded avoided cost rates. PacifiCorp does not agree that Rosebud Enterprises is entitled to these prices....

The pricing proposed by PacifiCorp is categorized into three distinct products: firm capacity, on-peak energy, and off-peak energy. PacifiCorp's proposed prices start with the SAR methodology-derived avoided costs but are adjusted to account for transmission constraints which limit the value of resources on the east side of its system.[5] PacifiCorp ships excess power produced in the eastern reaches of its territory during off-peak hours to re-pay power "borrowed" from Bonneville Power Administration (BPA) to meet on-peak demands for power in the western portion of its system. The fact that these east-west transmission lines are already loaded to capacity during off-peak hours affects the value of Rosebud's power to PacifiCorp.

Rosebud filed its proposed rates on July 14, 1994. Rosebud alleged that PacifiCorp's proposed on-peak/off-peak transmission adjustment to the SAR methodology avoided

5. PacifiCorp's eastern region consists of Utah, Wyoming, and southern Idaho. At the time Rosebud's complaint was filed, its western region

consisted of Oregon, Washington, Montana, California, and northern Idaho.

cost rates was not consistent with the established SAR methodology, amounted to an unapproved revision to PacifiCorp's previously published avoided cost rates, and violated the terms of an IPUC-approved merger agreement between Pacific Power and Light (PP & L) and Utah Power and Light (UP & L) pursuant to which the resulting entity, PacifiCorp, agreed to operate an "integrated system" comprised of PP & L's Oregon system and UP & L's Idaho system. Rosebud argued that it was entitled to the published avoided cost rates for cogenerators or small power producers of 10 megawatts or less without any adjustments.

PacifiCorp filed a motion for an IPUC order compelling Rosebud to negotiate. Rosebud responded, characterizing PacifiCorp's proposal as a "take it or leave it" proposition and reiterating its position that PacifiCorp ignored the applicable methodology in its proposal. Rosebud requested clarification of the meaning of the terms "existing avoided costs" and "existing methodology." The IPUC established a discovery and "prefile" schedule and set a public hearing.

### D. The Hearing and Resulting Orders No. 25870 & 25922

At the hearing before the IPUC, Rosebud offered testimony that PacifiCorp had been advised throughout the proceedings that its proposed Montpelier plant was intended to be identical to Rosebud's present operating facility at Colstrip, Montana, and that Rosebud already knew how much it would cost to build the facility and staff it. Further, Rosebud had a "pretty good handle on the fuel prices." However, Rosebud stated that it needed to firm up the power price before it could complete its viability assessment and be prepared to sign a power generation contract. Rosebud reiterated its claim of entitlement to the rates set forth in Order No. 24383 based on what it characterized as PacifiCorp's refusal to cooperate in good faith.

PacifiCorp argued that Rosebud failed to satisfy the IPUC's standards for entitlement

to grandfathered avoided cost rates and rejected Rosebud's argument that the provision of avoided cost prices by a utility are a prerequisite to a qualifying facility's ability to be "ready, willing, and able" to sign a contract. PacifiCorp noted that dispatchability is one of the factors identified by the IPUC to be considered in the individual negotiation of rates for qualifying facilities greater than 10 megawatts. To reflect the concept of dispatchability, PacifiCorp broke Rosebud's projected output into three "products." The first product, "capacity," is the ability of the plant to produce power at the time it is most needed by the utility. This product was priced on the basis of dollars per kilowatt per month, using the capacity costs of a gas-fired simple-cycle combustion turbine (SCCT) with a capacity factor of 88 percent, rather than the 75 percent SAR capacity factor.[6] The second product is energy delivered during on-peak hours and is priced at the fully-loaded energy cost of the SAR. This product represents the value of SAR-produced energy to the system when use of the energy is not constrained. The third product is energy delivered during off-peak hours and is priced in terms of the SAR operating costs PacifiCorp would avoid by accepting Rosebud energy into the system during times when its use is constrained due to lessened consumer demand and transmission limitations.

The IPUC made the following determination in final Order No. 25870:

Rosebud is entitled to receive rates for firm capacity and energy calculated and based on the grandfathered methodology established in the –170 avoided cost case and the UP & L rates preceding the Commission's January 14, 1994 Order NO. 25361. The Commission also approves the proposed adjustments and resultant rates as calculated by the Company and as reflected in its Exhibit No. 112, July 11, 1994 offer to Rosebud.

The IPUC based this conclusion in part on the observation that for projects greater than 10 megawatts the IPUC requires that rates

---

**6.** "Capacity factor" refers to the amount of energy, in megawatt or kilowatt hours, that a utility could expect to actually receive from the coal-fired SAR. It is also sometimes referred to as the

"equivalent availability factor." Capacity factor recognizes that a energy resource will not operate 100% of the time.

be "individually negotiated" the meaning of which "continues to be refined as we gain greater experience with larger projects." IPUC Order No. 25870.

Both Rosebud and PacifiCorp filed petitions for reconsideration. The IPUC denied both parties' petitions in Order No. 25922, finding that Order No. 25870 approved a method for calculating rates for Rosebud that was "fair, just and reasonable and consistent with the requirements of PURPA, the implementing regulations of FERC, and the related avoided cost methodology approved by this Commission."

## II.

### STANDARD OF REVIEW

This Court's jurisdiction to review decisions of the IPUC is limited by Article V, section 9 of the Idaho Constitution. *A.W. Brown Co. v. Idaho Power Co.*, 121 Idaho 812, 815, 828 P.2d 841, 844 (1992). The scope of the Court's limited review is defined in section 61–629 of the Idaho Code which states in relevant part:

> The review on appeal shall not be extended further than to determine whether the commission has regularly pursued its authority, including a determination of whether the order appealed from violates any right of the appellant under the constitution of the United States or of the state of Idaho.

I.C. § 61–629 (1994). Regarding questions of fact, this Court will uphold the IPUC's findings of fact where they are supported by substantial, competent evidence in the record. *A.W. Brown*, 121 Idaho at 815–16, 828 P.2d at 844–45. This Court will not displace the agency's choice between two fairly conflicting views, even though the Court may justifiably arrive at a different conclusion if the matter were before it *de novo*. *In re Application of Hayden Pines Water Co.*, 111 Idaho 331, 336, 723 P.2d 875, 880 (1986). Thus, the IPUC's findings of fact must be affirmed unless it appears that the clear weight of the evidence is against the conclusion, or that the evidence is strong and persuasive that the IPUC has abused its discre-

tion. *A.W. Brown*, 121 Idaho at 816, 828 P.2d at 845.

In addition to findings of fact based on substantial, competent evidence, the IPUC must explain the reasoning employed to reach its conclusions in order to ensure that the IPUC has applied relevant criteria prescribed by statute or its own regulations and thus has not acted arbitrarily or capriciously. *See Washington Water Power v. Idaho Pub. Util. Comm'n*, 101 Idaho 567, 575, 617 P.2d 1242, 1250 (1980) ("Not only must the Commission make and enter proper findings of fact, but it must set forth its reasoning in a rational manner."). Because regulatory bodies perform legislative as well as judicial functions in their proceedings, they are not so rigorously bound by the doctrine of *stare decisis* that they must decide all future cases in the same way as they have decided similar cases in the past. *Intermountain Gas Co. v. Idaho Pub. Util. Comm'n*, 97 Idaho 113, 119, 540 P.2d 775, 781 (1975). If, however, the IPUC decides a case in a manner contrary to prior IPUC rulings the Court will consider whether the IPUC has adequately explained the departure from prior rulings so that a reviewing court can determine that the decisions are not arbitrary and capricious. *Id.*

## III.

### THE IPUC'S APPROVAL OF PACIFI-CORP'S PROPOSED ADJUST-MENTS TO ITS PUBLISHED AVOIDED COST RATES WAS NOT ARBITRARY AND CAPRICIOUS.

In IPUC Order No. 25870, the IPUC found that Rosebud had obtained a legally enforceable right pursuant to 18 C.F.R. § 292.304(d)(2), to sell its capacity and energy to PacifiCorp at rates derived from the SAR methodology existing prior to January 14, 1994. Rosebud argues, however, that the IPUC denied Rosebud the benefit of this finding by: (1) approving PacifiCorp's use of a gas-fired simple cycle combustion turbine (SCCT) for computing avoided capital costs instead of the coal-fired steam generation plant used in the SAR methodology, despite the IPUC's earlier rejection of com-

bustion turbines as surrogate resources (IPUC Order No. 22636); (2) approving the use of an 88 percent capacity factor for computing energy payments rather than a 75 percent capacity factor as utilized in the SAR methodology; and (3) reducing PacifiCorp's avoided cost rate for "off-peak" energy by retroactively recognizing PacifiCorp's previously unsuccessful argument (IPUC Order No. 23358), regarding transmission line limitations between its east side and west side resources. Rosebud maintains that the IPUC's approval of PacifiCorp's departure from its published avoided costs was arbitrary and capricious.

The IPUC explained its departure from the established SAR methodology accordingly: "We believe the transmission limitations identified by the Company as early as November 11, 1992, (Exh. 102) and most recently described in its current Request for Proposals ... are legitimate and do affect the value of energy generated by this project." IPUC Order No. 25870. The IPUC further justified its departure from the established methodology by stating that: "This Commission has never established or published avoided cost rates for large QFs, i.e., QFs greater than 10 MW.... The reasonableness of proposed rates and/or adjustments for large QFs are considered by this Commission on a case-by-case basis." *Id.*

The IPUC's finding regarding the appropriateness of PacifiCorp's proposed contractual adjustments to its published avoided cost rates in order to establish a specific avoided cost rate for Rosebud's Montpelier project is a finding of fact, as to which the IPUC has broad discretion. The IPUC's findings of fact are not to be disturbed on appeal unless this Court concludes that the IPUC's findings are against the clear weight of the evidence or that the evidence is strong and persuasive that the IPUC abused its discretion. *Utah Idaho Sugar Co. v. Intermountain Gas Co.*, 100 Idaho 368, 376, 597 P.2d 1058, 1066 (1979).

Because Rosebud's Montpelier project is larger than 10 megawatts it is not eligible for PacifiCorp's published avoided costs. The IPUC has repeatedly stated that avoided cost rates for projects larger than 10 mega-

watts are to be established through negotiations between the qualifying facility and the utility, subject to IPUC approval. A utility's published avoided costs are to serve as a starting point for negotiations only, and individual consideration is to be given to such issues as "losses, reliability, ability to schedule, etc." IPUC Orders No. 15746, 20859, 22636, and 25454.

· At the May 11, 1994, prehearing conference PacifiCorp agreed to go along with Rosebud's proposal that the parties proceed with contract and rate negotiations along the lines of the procedures set out by the IPUC in *Rosebud Enterprises, Inc. v. Idaho Power Co.*, Case No. IPC–E–92–31, 1994 WL 232391. In that case the IPUC stated that, "existing SAR policy does not explain all the types of adjustments that may be made in negotiation with large QFs. That is why we have left the adjustments subject to negotiation.... The Company should make adjustments for all relevant factors. Our listing is only a suggestion and may not include every adjustment that is appropriate. The adjustments made will vary depending on project characteristics." Order No. 25454.

Contrary to Rosebud's assertion, PacifiCorp's proposed adjustments to its published avoided cost rates did not change the underlying methodology used to arrive at the published rates. Rather, the SAR-derived published rates were used as a starting point as required by the IPUC with adjustments made to reflect losses, reliability, ability to schedule, etc. specific to Rosebud's Montpelier project. PacifiCorp accomplished these adjustments by breaking Rosebud's power into separate capacity and energy components in order to reflect actual costs avoided.

The capacity costs were based on a SCCT plant rather than a coal-fired steam plant because the IPUC determined that SCCT capital costs represent PacifiCorp's actual avoided capacity costs. The balance of the SAR calculated capital costs were converted for payment through separate energy rates. The energy rates were broken down into on-peak and off-peak energy.

The on-peak energy rates include the energy component of the SAR capital cost based

on an 88 percent capacity factor. The 88 percent capacity factor was based on Rosebud's own figures and was used rather than the 75 percent factor in the SAR methodology, because it provides a more accurate allocation of capital costs based on the Montpelier project's expected performance. Using a 75 percent capacity factor would overcompensate Rosebud for the capacity costs PacifiCorp would actually avoid.

The off-peak energy rates reflect the fact that during off-peak hours PacifiCorp has a resource surplus in its eastern region. Due to transmission limitations between its east side generation resources and its west side load centers, some of the surplus energy is "trapped" on the east side. Thus, during off-peak hours the only costs Rosebud's Montpelier project would allow PacifiCorp to actually avoid are the running costs of existing low-cost resources. Fifty-seven percent of Rosebud's generation in a year would be during off-peak hours and, thus, would be priced at the lower, off-peak rate.

According to PacifiCorp the cost of failing to recognize the above factors would be substantial. The total cost of purchasing the output of Rosebud's Montpelier project over a 20–year term would be $68,283,000.00 higher under Rosebud's proposal than under PacifiCorp's proposal.

The IPUC's recognition of PacifiCorp's transmission limitations did not ignore prior IPUC decisions creating the SAR methodology. The IPUC found that "it is appropriate to consider [PacifiCorp's] entire integrated system for determining the amount and cost of avoidable transmission associated with the SAR." IPUC Order No. 23358. This finding did not relate to the value of off-peak energy generated on the east side of its system. It related to how much transmission, necessary to deliver the SAR-generated power into PacifiCorp's integrated system from western Wyoming, would be avoided by the purchase of power from a qualifying facility.

Contrary to Rosebud's assertion, the IPUC did not change the underlying established methodology for calculating PacifiCorp's avoided cost rates for Rosebud's Montpelier project. The requirement of individualized negotiations recognizes that large baseload resources may not necessarily conform to the capacity and energy needs of the purchasing utility and thus provides the utility the opportunity to calculate an avoided cost rate on a project-specific basis. The only certainty for projects larger than 10 megawatts, such as Rosebud's Montpelier facility, is that a purchasing utility's published avoided cost rates will be the starting point for negotiations. The established methodology, which Rosebud agreed to abide by, was further clarified in the IPUC's Notice of Procedure. In that notice the IPUC specifically noted that the existing SAR policy "does not explain all the types of adjustments that may be made in negotiation with large QFs."

The nature of the adjustments considered and approved by the IPUC in this case are related to: (1) PacifiCorp's ability to schedule Rosebud's output; (2) dispatchability of Rosebud's output; and (3) the value of the energy and capacity to PacifiCorp's system. Consideration of these factors is required by FERC and has been previously recognized by the IPUC as being of particular significance when negotiating with qualifying facilities larger than 10 megawatts. *See* 18 C.F.R. § 292.304(e)(1)-(4); IPUC Order No. 15746.

Rosebud is not entitled to a lock-in of an avoided cost rate until it has entered into a legally enforceable and IPUC approved obligation for the delivery of energy and capacity. The IPUC's finding in Order No. 25870 that Rosebud is entitled to "grandfathered treatment" for negotiation purposes is not equivalent to a finding that Rosebud is entitled to PacifiCorp's published avoided cost rates for a qualifying facility of 10 megawatts or less. Rather, the IPUC specifically stated that "Rosebud is entitled to a calculation of avoided cost rates using *as a 'starting point'* the firm rates established in Case Nos. UPL–E–89–5 (Order No. 23358) and UPL–E–92–4 (Order No. 24383)." IPUC Order No. 25870 (emphasis added). The non-binding "contract right" that Rosebud seeks is akin to the "option" to sell power at a fixed avoided cost rate that was rejected in *Empire Lumber Co. v. Washington Water Power Co.*, 114 Idaho at 192, 755 P.2d at 1230.

The evidence in this case is undoubtedly complex, and the conclusions reached from that evidence are subject to argument. The IPUC's findings are, however, supported by substantial, competent evidence. The factors which the IPUC considered are authorized by PURPA and FERC regulations. Rosebud has failed to demonstrate that the IPUC was not regularly pursuing its authority.

## IV.

### THE IPUC'S APPROVAL OF PACIFICORP'S PROPOSED ADJUSTMENTS TO ITS PUBLISHED AVOIDED COST RATES WAS NOT CONTRARY TO PURPA AND RELEVANT FERC REGULATIONS.

In accordance with section 292.304, each utility shall purchase any energy and capacity which is made available from a qualifying facility. 18 C.F.R. § 292.303 (1995). Rates for purchases shall not discriminate against qualifying cogeneration and small power production facilities. 18 C.F.R. § 292.304(a)(1)(ii). At the option of the qualifying facility, such rates shall be calculated either at the time of energy delivery or at the time a legally enforceable obligation to deliver energy is incurred. 18 C.F.R. § 292.304(d)(2).

Rosebud argues that any attempt to change or refuse to purchase a qualifying facility's capacity and energy at rates calculated under the avoided cost methodology existing at the time the qualifying facility incurred a legally enforceable right to a contract is prohibited by law, citing 18 C.F.R. §§ 292.303 -.304, and *West Penn Power Co.,* Docket No. EL95–30–000: Order Denying Petition for Declaratory Order (May 8, 1995). Rosebud asserts that the IPUC's approval of PacifiCorp's adjustments to its SAR methodology avoided costs in existence before January 14, 1994, is preempted by federal law.

Despite Rosebud's claims, the adjustments proposed by PacifiCorp and approved by the IPUC are consistent with PURPA's mandate that rates for the purchase of a qualifying facility's energy or capacity must not exceed the utility's avoided costs. 16 U.S.C.A. § 824a–3(b); 18 C.F.R. § 292.304(a)(2); *See*

*In re Southern Calif. Edison Co.,* FERC Docket No. EL95–16–000, *San Diego Gas & Elec. Co.,* 70 F.E.R.C.¶ 61,215, 1995 WL 169000 (Feb. 23, 1995) (Concluding that, "[a]s the electric utility industry becomes increasingly competitive, the need to ensure that the States are using procedures which ensure that QF rates do not exceed avoided costs becomes more critical. This is because QF rates that exceed avoided cost will, by definition, give QFs an unfair advantage over other market participants (non-QFs).''). *Id.* at pp. 61, 675–76.

FERC rules specify that in determining avoided costs the following factors shall be taken into account to the extent practicable:

> (2) The availability of capacity or energy from a qualifying facility during the system daily and seasonal peak periods, including:
>
>> (i) The ability of the utility to dispatch the qualifying facility;
>>
>> (ii) The expected or demonstrated reliability of the qualifying facility;
>>
>> . . . .
>>
>> (vi) The individual and aggregate value of energy and capacity from qualifying facilities on the electric utility's system; and
>>
>> . . . .
>
> (3) The relationship of the availability of energy or capacity from the qualifying facility as derived in paragraph (e)(2) of this section, to the ability of the electric utility to avoid costs, including the deferral of capacity additions and the reduction of fossil fuel use.

18 C.F.R. § 292.304(e)(2)-(3). PacifiCorp's adjustments to its published avoided costs relate directly to these factors.

Rosebud's reliance on *West Penn Power Co.,* is misplaced. Unlike the facts in *West Penn,* the IPUC's order did not seek to alter an existing contract. Rosebud has not incurred a legally enforceable obligation to sell power to PacifiCorp, and Rosebud does not have a "legally enforceable right" pursuant to 18 C.F.R. § 292.304(d)(2), to sell power to PacifiCorp at PacifiCorp's published avoided

cost rates for 10 megawatt or smaller qualifying facilities.

The IPUC approved a project-specific avoided cost rate for Rosebud's Montpelier project. Rosebud's attempt to secure a different rate must be weighed against the FERC requirement that prohibits the IPUC from setting a rate that exceeds PacifiCorp's avoided cost. PURPA § 210(b); 18 C.F.R. § 292.304(a)(2). Further, FERC requires that avoided cost rates be "just and reasonable" to a purchasing utility's consumers and in the public interest. 18 C.F.R. § 292.304(a)(1)(i). In *Intermountain Gas Co. v. Idaho Pub. Util. Comm'n*, this Court concluded that under the statutory standard of "just and reasonable" it is the result reached and not the method employed which is controlling. *Intermountain Gas*, 97 Idaho at 120, 540 P.2d at 782 (quoting *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 602, 64 S.Ct. 281, 287, 88 L.Ed. 333 (1944)).

Rosebud appears to have confused PacifiCorp's obligation to purchase power from Rosebud (and, consequently Rosebud's right to sell that power to PacifiCorp) pursuant to 18 C.F.R. § 292.303, with the language of 18 C.F.R. section 292.304(d)(2) which provides that once Rosebud has acted upon that right and incurred a legally enforceable obligation to sell power to PacifiCorp, Rosebud may elect to sell its power at the utility's then-current avoided cost rate. No such obligation has been incurred. Therefore, 18 C.F.R. section 292.304(d)(2) is inapplicable.

The IPUC's approval of PacifiCorp's proposed adjustments to its published avoided costs was not contrary to PURPA and relevant FERC regulations.

## V.

## THE IPUC'S APPROVAL OF PACIFICORP'S PROPOSED ADJUSTMENTS TO ITS PUBLISHED AVOIDED COSTS DID NOT SUBJECT ROSEBUD TO PROHIBITED STATE REGULATION.

Rosebud maintains that qualifying facilities are exempted from state laws and regulations respecting rates, financing, or or-

ganization, citing 16 U.S.C. § 824a–3(e)(1); *Freehold Cogeneration Assoc. v. Board of Regulatory Com'rs of State of N.J.*, 44 F.3d 1178 (3d Cir.1995), *cert. denied sub. nom. Jersey Cent. Power & Light Co. v. Freehold Cogeneration Assoc.*, —— U.S. ——, 116 S.Ct. 68, 133 L.Ed.2d 29 (1996), and that the IPUC's approval of PacifiCorp's proposed adjustments to the SAR avoided costs is a form of prohibited on-going regulation. According to Rosebud, once set by the IPUC, the established methodology is not subject to retroactive change prior to public hearings and administrative procedures as a means to reduce avoided costs to which a qualifying facility is otherwise entitled. *See Afton Energy, Inc. v. Idaho Power Co.*, 107 Idaho at 787, 693 P.2d at 434 (FERC's comments make it clear that if the qualifying facility exercises its option to receive avoided costs at the time its obligation to supply energy is incurred, that rate is to be maintained for the duration of the contract.).

Rosebud's reliance on *Freehold* is misplaced. *Freehold* involved an attempt by the New Jersey Board of Regulatory Commissioners (BRC) to reopen a power purchase agreement that had been entered into between Freehold and Jersey Central Power and Light Company. The executed agreement had previously been approved by the BRC. Unlike the facts in *Freehold*, no contractual agreement had been entered into, nor had the IPUC previously approved avoided costs specific to Rosebud's Montpelier project, prior to the issuance of Order No. 25870.

Qualifying facilities are exempted from state laws and regulations respecting (i) the rates of electric utilities; and (ii) the financial and organizational regulation of electric utilities. PURPA section 210(e); 18 C.F.R. § 292.602(c) (1995). No qualifying facility is, however, exempted from state laws or regulations implementing PURPA. PURPA section 210(e)(3); 18 C.F.R. § 292.602(c)(2); 18 C.F.R. § 292.401 (1995). What Rosebud characterizes as on-going regulation was simply a project-specific determination of rates for a qualifying facility greater than 10 megawatts.

As noted, Rosebud's reliance on *Freehold* is misplaced. Rosebud does not have an executed power purchase contract. *Afton Energy* is likewise inapposite: Rosebud does not have a contract and, consequently, has not incurred a legally enforceable obligation to provide power.

The IPUC acted within its authority.

## VI.

### THE IPUC PROPERLY DETERMINED THAT ROSEBUD WAS ENTITLED TO USE SUPERSEDED AVOIDED COSTS TO ASSESS PROJECT VIABILITY.

■■■■ PacifiCorp objects to Order No. 25870 which states that Rosebud is entitled to a "firm offer of rates" based on Pacifi-Corp's pre-January 1994 avoided costs on the basis that this order gives Rosebud an option to obtain prices at some point in the future based upon rates in excess of PacifiCorp's avoided costs. If parties are required by state law or policy to sign contracts that reflect rates for QF sales at wholesale that are in excess of avoided cost, those contracts will be considered *void ab initio. See Connecticut Light & Power Co.*, 70 F.E.R.C. ¶ 61,012 (1995), *reconsideration denied*, 71 F.E.R.C. ¶ 61,035 (1995).

However accurate PacifiCorp's proposition might be in the abstract, it is not applicable to the record as it exists in this case. The IPUC takes the position that Order No. 25870 does not grant Rosebud an open-ended option to sell power to PacifiCorp at Pacifi-Corp's pre-January avoided cost rates but only mandates a pre-contract rate for project viability assessment. The ultimate avoided cost rate will be determined at a future time if Rosebud continues with the project. What Rosebud gets now is a starting point for negotiations based upon the superseded avoided costs. The degree to which the IPUC might adjust those avoided costs is problematic and cannot be determined at this time.

The record of proceedings in this case before the IPUC indicates that the IPUC had a justifiable basis for requiring Pacifi-Corp to make an offer of rates based upon the superseded avoided costs. PacifiCorp resisted providing Rosebud with a firm rate for assessing project viability, making repeated requests for information instead: 1) January 13, 1993: PacifiCorp provided Rosebud with an "energy" rate proposal that was not derived from the established methodology; 2) April 16, 1993: PacifiCorp provided Rosebud with "informational pricing" based on market alternatives not based on the established methodology; 3) December 30, 1993: In a negotiation session, PacifiCorp provided Rosebud with a copy of a Power Purchase Agreement it signed with a large power producer in Hermiston, Oregon; 4) January 31, 1994: PacifiCorp declined to accept the Hermiston project as a basis for negotiation; 5) All proposals and counter-proposals of Rosebud were rejected; 6) The type and nature of adjustments determined to be reasonable for a resource on the east side of PacifiCorp's system were known to PacifiCorp as early as November of 1992 and April of 1993.

The issue before the IPUC was not Rosebud's entitlement to a contract and a lock-in of a grandfathered avoided-cost rate. The issue was Rosebud's right as a larger–than–10–megawatt qualifying facility to have PacifiCorp calculate a project-specific rate for Rosebud to use in assessing project viability.

The reasonableness of a proposed rate is determined by assessing the respective rights and obligations of the parties. Time of performance is a critical element when delay results in a change in rates and/or project costs. PacifiCorp should not be permitted to avoid its statutory obligation to purchase or frustrate Rosebud's right to sell its power by failing to timely provide a rate to determine project viability. The governing principle in this case is similar to that of recent FERC cases wherein FERC held that contract rates maintain their validity regardless of subsequent price changes. *See West Penn Power Co.*, Docket No. EL95–30–000; 18 C.F.R. § 292.304(b)(5).

■■■■ According to the FERC, "[i]t is up to the States, not this Commission, to determine the specific parameters of individual QF power purchase agreements, including

the date at which a legally enforceable obligation is incurred under State law." *West Penn Power Co.,* 71 FERC ¶ 61,153 (1995) (footnote omitted). Conferment of grandfathered status on qualifying facility is essentially an IPUC finding that a legally enforceable obligation to sell power existed by a given date. Such a finding is within the discretion of the state regulatory agency.

The IPUC recognized that Rosebud was delayed in its efforts to determine project viability by PacifiCorp. The IPUC's effort to correct the effect of this delay is within its authority. The IPUC decision is not a final determination of avoided costs, but puts Rosebud in the position of determining the viability of its project using rates that reflect the time frame Rosebud should have been able to proceed but for the delays caused by PacifiCorp. Whether the remedy is illusory or not cannot be determined at this time, but the action was within the proper authority of the IPUC and based upon substantial and competent evidence.

## VII.

### ORDERS NO. 25870 AND 25922 ADEQUATELY SET FORTH FINDINGS OF FACT AND REASONING TO SUPPORT THE IPUC'S CONCLUSION THAT ROSEBUD'S MONTPELIER PROJECT IS ENTITLED TO A POWER PURCHASE CONTRACT BASED UPON SUPERSEDED AVOIDED COSTS.

■ PacifiCorp argues that IPUC Orders No. 25870 and 25922 do not adequately set forth findings of fact in that they do not contain: 1) any finding that Rosebud had incurred a legally enforceable obligation; or 2) any findings regarding Rosebud's "ready, willing, and able" status or the existence of "but for" conduct on the part of PacifiCorp.

PacifiCorp's contention that the IPUC's decisions in Orders No. 25879 and 25922 are not supported by adequate findings of fact and reasoning is belied by a review of the record and the resultant orders. The IPUC's conclusion is preceded by a sample recitation of the evidence and the parties' respective positions. When viewed in context, the IPUC's conclusions indicate an implicit adoption of Rosebud's position regarding whether it is entitled to "grandfathered" treatment.

■ The IPUC's findings need not take any particular form so long as they fairly disclose the basic facts upon which the IPUC relies and support the ultimate conclusions. What is essential are sufficient findings to permit the reviewing court to determine that the IPUC has not acted arbitrarily. *Boise Water Corp. v. Idaho Pub. Util. Comm'n,* 97 Idaho 832, 840, 555 P.2d 163, 171 (1976). The IPUC's findings are adequate for the purpose of appellate review and support the decision of the IPUC.

## VIII.

### CONCLUSION

The decisions of the IPUC are affirmed. The IPUC is awarded costs from Rosebud and PacifiCorp. No other costs are awarded. No attorney fees are allowed.

McDEVITT, C.J., JOHNSON and SILAK, JJ., and REINHARDT, Justice Pro Tem, concur.