J. JONES, Justice,
concurring in the result.
I concur in the result reached by the IPUC and affirmed by the Court. However, I am uncomfortable with the route taken by the IPUC in reaching its final resolution of this case, as the three orders issued by the IPUC are somewhat unclear, and rather in conflict, as to the elements of a legally enforceable obligation (LEO) and how a qualifying facility (QF) may obtain grandfathering status. Because these issues are of vital importance to both utilities and QFs, it is essential that they have understandable and predictable criteria for their planning and contracting activities. That is not what occurred in these proceedings.
The parties entered into two contracts, each specifically stating the effective date to be December 28, 2010. Idaho Power signed the contracts on that date. The IPUC held that that was the date upon which the parties had a legally enforceable obligation because it was the date the contracts were fully exe *790 cuted. The IPUC disapproved the contracts, holding that they did not become effective until signed by both parties and that because the projects exceeded the eligibility cap established as of December 14, 2010, Grouse Creek was not eligible for the rates provided for in the contracts.
The IPUC correctly characterized the contracts as LEOs and had a basis for determining that December 28 was their effective date. Grouse Creek is unhappy that Idaho Power inserted the December 28, 2010 effective date into the contracts after Grouse Creek had signed them. At oral argument, Grouse Creek’s counsel indicated that this was in keeping with Idaho Power’s usual practice. However, Grouse Creek was aware of the IPUC proceedings pertaining to the eligibility cap and that any decision on lowering the cap would be effective as of December 14, 2010. The contracts were specifically subject to, and conditioned upon, IPUC approval of the entirety of their provisions. If Grouse Creek had concerns that the effective date inserted into the contracts would be determinative of its rights, it could have inserted a different effective date into the contracts instead of leaving it to Idaho Power to do so. Grouse Creek has made no claim of fraud or other grounds for avoidance of the December 28 effective date.
Rather than simply stating that Grouse Creek could not pursue a non-contractual LEO theory, since it had voluntarily entered into a contractual LEO with Idaho Power, the IPUC addressed the issue of whether an LEO had arisen prior to December 28. In doing so, the IPUC relied upon the integration clause in the contracts. In its final order, Order No. 32635, issued on September 7, 2012, the IPUC stated:
Because the parties have existing contracts, and we find no undue or unreasonable delay on the part of Idaho Power, a determination of the existence of a legally enforceable obligation at another point in time is unnecessary. Moreover, the parties agreed that all prior agreements were superseded by the December 28, 2010 PPAs. Here the Commission did not have to determine whether a legally enforceable obligation arose because the parties entered into written Agreements____ We also find that the Agreements expressly supersede all prior agreements, including any entitlement to an otherwise enforceable legal obligation.
Id. at 1617. The problem with these holdings is that the parties did not have “existing contracts.”
What the IPUC failed to take into account in relying on the December 28 contracts is the fact that both contracts were contingent upon a condition precedent[1].
This Agreement shall become finally effective upon the Commission’s approval of all terms and provisions hereof without change or condition and declaration that all payments to be made to [Grouse Creek] hereunder shall be allowed as prudently incurred expenses for ratemaking purposes.
This condition was not fulfilled because the IPUC disapproved the contracts and they thus became null and void. The IPUC cannot disapprove the contracts, thereby invalidating them pursuant to their express terms, and then rely on them to rule against a contracting party.
Furthermore, the integration clause in the contracts does not negate the existence of a non-contractual LEO. That provision reads: *791 This provision, like all of the other provisions in the contracts, became superfluous and of no force or effect upon failure of the condition precedent. Where the parties specifically agreed that the IPUC must approve all terms and provisions of the contract without change or condition, the IPUC does not have the ability to selectively enforce any provision of the contracts against any contracting party. Of more importance is the fact that the integration clause only pertains to oral or written agreements. It does not extend beyond “agreements” to include negotiations, representations, and the like. An LEO is not always an agreement, as the IPUC appears to have assumed. An LEO, by its very nature, is usually something less than an oral or written agreement. It can be established by a “meritorious complaint alleging that the project is mature and that the developer has attempted and failed to negotiate a contract with the utility.” Rosebud Enterprises, Inc. v. Idaho Public Utilities Comm’n (Rosebud II), 131 Idaho 1, 6, 951 P.2d 521, 526 (1997). A contract or agreement is a variety of LEO but an LEO is not always a contract or agreement.
*790 This Agreement constitutes the entire Agreement of the Parties concerning the subject matter hereof and supersedes all prior or contemporaneous oral or written agreements between the Parties concerning the subject matter hereof.
*791 An LEO is a somewhat amorphous product of a combination of federal and state laws based on PURPA. Although states must implement PURPA pursuant to FERC regulations, “FERC has adopted regulations ... [that] afford state regulatory authorities ... latitude in determining the manner in which the regulations are to be implemented.” F.E.R.C. v. Mississippi 456 U.S. 742, 751, 102 S.Ct. 2126, 2133, 72 L.Ed.2d 532, 541-42 (1982). This latitude extends to the way in which legally enforceable obligations are created. In Rosebud Enterprises, Inc. v. Idaho Public Utilities Comm’n (Rosebud I), 128 Idaho 609, 623-24, 917 P.2d 766, 780-81 (1996) (quoting West Penn Power Co., 71 FERC ¶ 61,153 (1995)), the Court noted that, according to FERC, “ ‘[i]t is up to the States,’ ” not FERC, “ ‘to determine the specific parameters of individual QF power purchase agreements, including the date at which a legally enforceable obligation is incurred under State law.’ ”
A state’s latitude, however, has limits. FERC provides that a QF may provide energy to a utility either by entering into a contract or through a legally enforceable obligation. 18 C.F.R. § 292.304(d). In implementing PURPA, “states must provide for legally enforceable obligations as distinct from contractual obligations.... ” Power Resource Group, Inc. v. Public Utility Comm’n of Texas, 422 F.3d 231, 238 (5th Cir.2005). FERC explains that “[t]his option to sell via legally enforceable obligation was ‘specifically adopted to prevent utilities from circumventing the requirement of PURPA that utilities purchase energy and capacity from QFs.’ ” Grouse Creek Wind Park, LLC, 142 FERC ¶ 61187 at P 40 (citing Cedar Creek, 137 FERC ¶61006 at P 32).[2] FERC explained:
[Grouse Creek is] thus entitled to a legally enforceable obligation in those situations where, for example, a utility has refused to negotiate a contract. In order to protect the rights of a QF, once a QF makes itself available to sell to a utility, a legally enforceable obligation may exist prior to the formation of a contract. A contract serves to limit and/or define bilaterally the specifics of the relationship between the QF and the utility. A contract may also limit and/or define bilaterally the specifics of the *792 legally enforceable obligation at the heart of that relationship. But the obligation can pre-date the signing of the contract. Moreover, the tool of “seek[ing] state regulatory authority assistance to enforce the PURPA-imposed obligation” does not mean that seeking such assistance is a necessary condition precedent to the existence of a legally enforceable obligation.

Id.

FERC stated that the IPUC’s “limitation on the conditions for legally enforceable obligation formation overlooked ‘the fact that a legally enforceable obligation may be incurred before the formal memorialization of a contract to writing.’” Id. at P. 36 (citing Cedar Creek, 137 FERC ¶ 61,006 at P 36). FERC noted that its regulations “expressly use the terms ‘contract’ and ‘legally enforceable obligation’ in the disjunctive to demonstrate that a legally enforceable obligation includes, but is not limited to, a contract.” Cedar Creek, 137 FERC ¶ 61,006 at P 35. Indeed, an LEO may be formed unilaterally, through the actions of a QF. FERC indicated in Cedar Creek, that a QF creates an LEO “by committing itself to sell to an electric utility,” because this commitment by the QF “also commits the electric utility to buy.” 137 FERC ¶ 61,006 at P 32.
Language in the IPUC orders creates confusion as to what is required to establish an LEO. In Order No. 32257, the IPUC stated that it “does not consider a utility and its ratepayers obligated until both parties have completed their final reviews and signed the agreement.” Id. at 9. In its order on reconsideration, Order No. 32299, the IPUC found that “a legally enforceable obligation is incurred and a contract is fully executed upon the signature of both parties.” Id. at 8. These statements suggest the IPUC failed to recognize that a utility may be obligated to purchase a QF’s energy even if it does not agree to the terms of a QF’s commitment to sell to it. FERC explicitly stated that “the phrase legally enforceable obligation is broader than simply a contract between an electric utility and a QF,” because “the phrase is used to prevent an electric utility from avoiding its PURPA obligations by refusing to sign a contract, or ... delaying the signing of a contract, so that a later and lower avoided cost is applicable.” Cedar Creek, 137 FERC ¶ 61,006 at P 32. However, the IPUC then corrected these statements in its final order, Order No. 32635, by stating:
We have a long history of recognizing two methods by which a QF can obtain an avoided cost rate in Idaho: (1) by entering into a signed contract with the utility; or (2) by filing a meritorious complaint alleging that ‘a legally enforceable obligation’ has risen and, but for the conduct of the utility, there would be a contract.
Id. at 12 (citing Rosebud II and A.W. Brown v. Idaho Power Co., 121 Idaho 812, 816, 828 P.2d 841, 845 (1992)). The IPUC went on to state that its “application of this framework conforms with FERC’s analysis of its standards,” stating those standards to be:
Thus, under our regulations, a QF has the option to commit itself to sell all or part of its electric output to an electric utility. While this may be done through a contract, if the electric utility refuses to sign a contract, the QF may seek state regulatory authority assistance to enforce the PURPA-imposed obligation on the electric utility to purchase from the QF, and a non-contractual, but still legally enforceable, obligation will be created pursuant to the state’s implementation of PURPA. Accordingly, a QF, by committing itself to sell to an electric utility, also commits the electric utility to buy from the QF; these commitments result either in contracts or in non-contractual, but binding, legally enforceable obligations.
Id. at 1213 (quoting JD Wind 1, 129 FERC ¶ 61,148 at 61,633). The IPUC continued:
Either the parties enter into a contract or, if the utility is failing to negotiate or refusing to enter into a contract with a QF, the QF can file a complaint with this Commission, at which time the Commission will make a determination as to whether and *793 when a legally enforceable obligation arose.
Id. at 13. Then, the Commission said what it should have said in the very first instance, “[w]hen a contract has been entered into by the parties and submitted for approval, there is no need for a determination regarding any other legally enforceable obligation.” Id. Had the IPUC said exactly that in its first order, rather than appearing to equate an LEO with a contract and requiring a signature for both, the confusion created by its first two orders might have been averted.
An LEO is a significant protection for a QF that is dealing with an intransigent electric utility. By committing itself to sell its output to an electric utility, a QF has an alternate non-contractual route to pursue. It does not require signatures or all of the attendant features of a contract. However, where the utility does agree to terms acceptable to the QF, the alternate route is not necessary. It may well be that Grouse Creek’s filing of the complaints against Idaho Power on November 8, 2010, jump-started the negotiations that produced the contracts. Once voluntary contracts were entered into by the parties, the non-contractual LEO alternative was no longer necessary for, or available to, Grouse Creek. It had an actual LEO. Unfortunately for Grouse Creek, it had voluntarily agreed to terms that turned out not to be to its advantage. By ceding to Idaho Power the ability to establish the effective date of the contracts, and knowing of the ongoing proceeding where the IPUC had notified interested parties that a change in the eligibility cap was under consideration and would be effective as of December 14, 2010, Grouse Creek was clearly taking a gamble — one which it lost.
Unfortunately, after hitting the nail on the head, the IPUC went on to find “that a legally enforceable obligation did not arise prior to December 14, 2010, because material terms of the Agreements were still incomplete on that date,” and “that the Agreements expressly supersede all prior agreements.” Again, these statements seem to imply that an LEO is necessarily a contract, entailing all of the elements of a contract. Order No. 32635 at 16 and 17. There was no need to insert this superfluous, confusing language into the order.
Grouse Creek also claims that the IPUC acted in an arbitrary and capricious manner by failing to grandfather its projects, pointing out that the IPUC’s action was inconsistent with previous grandfathering decisions. The three orders filed by the IPUC do appear to be inconsistent with the grandfathering criteria it laid out in 2005, when, as in this case, it was in the process of lowering the posted rate eligibility cap. In the Matter of Suspending Idaho Power’s PURPA Obligation, Case No. IPC-E-05-22. In that proceeding, the Commission found it “reasonable to establish [certain] criteria to determine the eligibility of PURPA qualifying wind generating facilities for contracts at the published avoided cost rates.” Order No. 29839 at 9. The criteria were:
(1) [S]ubmittal of a signed power purchase agreement to the utility, or (2) submittal to the utility of a completed Application for Interconnection Study and payment of fee. In addition to a finding of existence of one or both of the preceding threshold criteria, the QF must also be able to demonstrate other indicia of substantial progress and project maturity, e.g., (1) a wind study demonstrating a viable site for the project, (2) a signed contract for wind turbines, (3) arranged financing for the project, and/or (4) related progress on the facility permitting and licensing path.
Id. at 10. The IPUC later affirmed this grandfathering criteria, noting that it developed the requirements “to recognize and not discount the considerable time, effort and energy expended by some QFs in developing their projects____” Order No. 29872 at 10.
An examination of some of the IPUC’s past decisions citing Order Nos. 29829 and 29872 demonstrates a lack of consistency. In Salmon Falls, a case decided after the 2005 change in posted rate eligibility, Idaho Power and a QF submitted an agreement for ap *794 proval and sought grandfathering. Order No. 29951. The Commission found that the “Firm Energy Sales Agreement” presented by Idaho Power was acceptable because the “project satisfie[d] the grandfathering eligibility criteria established in Order Nos. 29839 and 29872 in Case No. IPC-E-05-22.” Id. at 5. The IPUC noted that “the Agreement will not become effective until the Commission has approved all the Agreement’s terms and conditions____” Order No. 29951 at 2. Notably, the Commission made no mention of the agreement’s effective date.
In Yellowstone Power, a QF and Idaho Power submitted an agreement, dated July 28, 2010, to the IPUC for approval, but maintained that the QF was entitled to avoided cost rates that had changed on March 16, 2010. Order No. 32104. In that case, there was no “contract to purchase the QF generation on or before March 16, 2010, nor had Yellowstone filed a complaint alleging that Idaho Power acted unreasonably or in bad faith by not signing an agreement before March 16 when the rates changed.” Id. at 3. Furthermore, the record did not reveal “any documentation” to indicate “that there was a meeting of the minds prior to March 16, 2010.” Id. at 6. Despite these irregularities, the IPUC nonetheless approved the agreement as submitted, granting the QF grandfathered status and entitlement to the rates published prior to March 16. Id. at 12. Here, too, the IPUC noted that “[b]y its own terms, the Agreement will not become effective until the Commission has approved all of the Agreement’s terms and conditions and declares that all payments made by Idaho Power to [the QF] for purchases of energy will be allowed as prudently incurred expenses for ratemaking purposes.” Order No. 32104 at 5.
In Cargill, Idaho Power sought grandfathering for a QF, arguing that “all outstanding contract issues had been resolved ... and that but for the internal review process of [Idaho Power] a contract would have been signed” prior to the rate change. Order No. 32024 at 4. Although the QF had not filed a complaint with the IPUC as required by AW. Brown, “by signing the Agreement and voluntarily presenting it to the Commission, Idaho Power has nevertheless concluded that [the QF] meets the second test of the Commission and should be entitled” to grandfathering. Id. at 2. The IPUC Staff offered its opinion “that the grandfathering criteria developed and applied by Idaho Power in this case are fair and reasonable.” Id. at 3. The IPUC again noted that the “Agreement will not become effective until the Commission has approved all of the Agreement’s terms and conditions____” Order No. 32024 at 3. With little discussion, the IPUC granted grandfathering to the QF, stating that Idaho Power “fairly represented” IPUC’s “past grandfathering requirements” and, citing AW. Brown, stated that Idaho Power’s “approach in this case regarding contract rates” was “in concert with the spirit of those prior grandfathering cases.” Id. at 4. Grandfathering, of course, is not the province of Idaho Power, but instead “is essentially an IPUC finding that a legally enforceable obligation to sell power existed at a given date.” Rosebud I, 128 Idaho at 624, 917 P.2d at 781.
The IPUC, as a regulatory body, may depart from its previous decisions regarding grandfathering. “Because regulatory bodies perform legislative as well as judicial functions in their proceedings, they are not so rigorously bound by the doctrine of stare decisis that they must decide all future cases in the same way as they have decided similar cases in the past.” Id. at 618, 917 P.2d at 775. Indeed, “[b]ecause each case presents a myriad of facts that distinguish it, no one case represents the law by which subsequent parties are bound.” Id. at 615, 917 P.2d at 772. Nonetheless, the IPUC must “demonstrate that it has applied the criteria prescribed by statute and by its own regulations and has not acted arbitrarily or on an ad hoc basis.... ” Washington Waier Power v. Idaho Public Utilities Comm’n, 101 Idaho 567, 575, 617 P.2d 1242, 1250 (1980) (quoting Home Plate, Inc. v. OLCC, 20 Or.App. 188, 190, 530 P.2d 862, 863 (1975)). Here, with little explanation, the IPUC appears to have departed from its own line of orders on *795 grandfathering and seemingly created new criteria applicable to Grouse Creek alone-determining the grandfathering issue on the basis of when the contracts were fully executed.
In Order No. 32257, the IPUC indicates that grandfathering applies only to changes in rates and not eligibility size. Id. at 10. Then, in Order No. 32299, the IPUC seems to imply that the grandfathering concept applies to both. Order No. 32635 does not specifically address grandfathering criteria but it clearly appears that the Commission declined to grandfather the Grouse Creek contracts because those contracts were not signed by both parties until December 28, 2010. Id. at 1617. No mention is made of the various holdings that an agreement does not become effective until the IPUC has approved all of its terms and conditions. Nor does the IPUC indicate what might have happened if the parties had agreed to an effective date prior to December 14, even though the contracts were actually signed after that date. In other words, it remains an open question as to whether the IPUC would still refuse to grandfather if the parties selected an effective date prior to the change in rates or eligibility but after the contracts were signed by both parties. And, in the case where a non-contractual LEO is found to exist, where neither party may have signed the contract, it is not clear whether the IPUC would apply the criteria set out in Order No. 29839.
As noted above, the IPUC may change its criteria regarding grandfathering but, if it does so, it should demonstrate that it is not acting arbitrarily or in an ad hoc manner. Here, the IPUC has provided little explanation for its departure from the grandfathering criteria stated in Order No. 29839 and subsequent orders. It primarily hangs its hat on the December 28, 2010 effective date of the contracts and finds that “[t]he rates in the Agreements, as written, do not comply with Commission Order No. 32176.” This reference to the order changing the eligibility cap is minimal support for the change but probably sufficient to satisfy the need for explanation since Order No. 32176 does contain discussion, policy considerations, and a policy determination regarding the eligibility cap.
It is not the intent hereof to be overly critical of the IPUC because it and its members are conscientious and provide good public service. The orders in this case have the potential, however, of creating confusion on two important issues the criteria for establishing a non-contractual LEO and for qualifying for grandfather status. Careful wording is essential to eliminate confusion and provide predictability for interested parties.

. We stated in Weisel v. Beaver Springs Owners Ass’n, Inc.:
A condition precedent is an event not certain to occur, but which must occur, before performance under a contract becomes due.... When there is a failure of a condition precedent through no fault of the parties, no liability or duty to perform arises under the contact.
152 Idaho 519, 528, 272 P.3d 491, 500 (2012).

. Although a FERC declaratory order does not "fix the rights of the parties,” it does "advise the parties of the Commission’s position.” Indus. Cogenerators, 47 F.3d at 1235. A FERC declaratory order is "much like a memorandum of law prepared by the FERC staff in anticipation of a possible enforcement action,” and is also "formally used” by FERC "as its own statement of position.” Id. As a general rule, courts defer to an agency's interpretation of its own regulations unless the interpretation is "plainly erroneous or inconsistent with the regulation.” Auer v. Robbins, 519 U.S. 452, 461, 117 S.Ct. 905, 911, 137 L.Ed.2d 79, 90 (1997). For example, in the recent Decker v. Northwest Environmental Defense Center, the Supreme Court proclaimed it “well established that an agency’s interpretation need not be the only possible reading of a regulation — or even the best one — to prevail.” - U.S. -, 133 S.Ct. 1326, 1337, 185 L.Ed.2d 447, 461-62 (2013). Because FERC’s declaratory orders interpret its own regulations, they are not binding on this Court but do offer persuasive authority and are entitled to deference.