**IN THE SUPREME COURT OF THE STATE OF IDAHO**
**Docket No. 39151-2011**

| | | |
|---|---|---|
| **IDAHO POWER COMPANY,** | ) | |
| | ) | **Boise, August 2013 Term** |
| Petitioner-Respondent, | ) | |
| | ) | **2013 Opinion No. 135** |
| v. | ) | |
| | ) | **Filed: December 18, 2013** |
| **IDAHO PUBLIC UTILITIES** | ) | |
| **COMMISSION,** | ) | **Stephen W. Kenyon, Clerk** |
| | ) | |
| Respondent, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **GROUSE CREEK WIND PARK, LLC, and** | ) | |
| **GROUSE CREEK WIND PARK II, LLC,** | ) | |
| | ) | |
| Appellants. | ) | |
| | ) | |

Appeal from the Public Utilities Commission of the State of Idaho.

The order of the Public Utilities Commission is <u>affirmed</u>.

Ronald L. Williams, Williams Bradbury P.C., Boise argued for appellants.

Kristine A. Sasser, Deputy Attorney General, Boise, argued for respondent Public Utilities Commission.

Donovan E. Walker, Idaho Power Company, Boise, argued for respondent Idaho Power Company.

---

EISMANN, Justice.

This is an appeal from an order of the Idaho Public Utilities Commission denying approval of contracts between an electric utility and two wind farms on the ground that the contract rate for purchasing the power was contrary to public policy because it exceeded the utility's avoided costs. We affirm.

# I.
## Factual Background.

The Public Utility Regulatory Policies Act of 1978 (PURPA) was enacted to require electric utilities to purchase electricity from qualifying small power production facilities and from qualifying cogeneration facilities. "A 'small power production facility' is one that has a production capacity of no more than 80 megawatts and uses biomass, waste, or renewable resources (such as wind, water, or solar energy) to produce electric power." *F.E.R.C. v. Mississippi*, 456 U.S. 742, 750 n.11 (1982). "A 'cogeneration facility' is one that produces both electric energy and steam or some other form of useful energy, such as heat." *Id*. The legislation required the Federal Energy Regulatory Commission (FERC) to prescribe rules to encourage cogeneration and small power production and to require electric utilities to offer to purchase electric energy from qualifying facilities. 16 U.S.C. § 824a–3(a) & (b).

PURPA "directs FERC, in consultation with state regulatory authorities, to promulgate 'such rules as it determines necessary to encourage cogeneration and small power production,' including rules requiring utilities to offer to sell electricity to, and purchase electricity from, qualifying cogeneration and small power production facilities." *F.E.R.C.*, 456 U.S. at 751; 16 U.S.C. § 824a–3(b). However, PURPA provides that no such rule "shall provide for a rate which exceeds the incremental cost to the electric utility of alternative electric energy." 16 U.S.C. § 824a–3(b). The incremental cost is defined as "the cost to the electric utility of the electric energy which, but for the purchase from such cogenerator or small power producer, such utility would generate or purchase from another source." 16 U.S.C. § 824a-3(d). FERC's rules use the term "avoided costs" to mean the incremental cost. 18 C.F.R. § 292.101(a)(6).

If a state chooses to regulate electric utilities, it must implement FERC rules. *F.E.R.C.*, 456 U.S. at 751; 16 USC § 824a–3(f)(1). However, a state regulatory authority has discretion in determining the manner in which the rules will be implemented, and may comply by issuing regulations, by resolving disputes on a case-by-case basis, or by other action reasonably designed to give effect to FERC's rules. *F.E.R.C.*, 456 U.S. at 751. The " 'Act establishes a program of cooperative federalism that allows the States, within limits established by federal minimum standards, to enact and administer their own regulatory programs, structured to meet their own particular needs.' " *Id*. at 767.

FERC's rules acknowledge two ways in which a qualified facility can establish a right to sell power to an electric utility. The utility and the facility can negotiate a rate at which the utility will purchase the electric power, 18 C.F.R. § 292.301(b)(1), or the facility can establish the right to require the utility to purchase the power "pursuant to a legally enforceable obligation for the delivery of energy or capacity over a specified term," 18 C.F.R. § 292.304(d)(2). When it adopted the latter rule, FERC explained its purpose as follows:

> Paragraph (d)(2) permits a qualifying facility to enter into a contract or other legally enforceable obligation to provide energy or capacity over a specified term. Use of the term "legally enforceable obligation" is intended to prevent a utility from circumventing the requirement that provides capacity credit for an eligible qualifying facility merely by refusing to enter into a contract with the qualifying facility.

45 Fed. Reg. 12214, 12224 (February 25, 1980).

FERC requires that there be a standard avoided-cost rate at which electric utilities are required to purchase power from qualified facilities with a design capacity of up to 100 kilowatts. 18 CFR § 292.304(c)(1). The standard avoided-cost rate is called the "published rate" by IPUC. The limit on the size of the qualified facility that is eligible for the published rate is commonly referred to as the "eligibility cap." Qualified facilities within the eligibility cap are entitled to sell power at the published rate, while the rate at which those above the eligibility cap are entitled to sell power is determined on a case-by-case basis.

IPUC initially set the eligibility cap at one megawatt, but it later increased it for wind projects to an average of ten megawatts (10 aMW) on a monthly basis. Because wind projects do not generate power all of the time, a qualified wind facility that is capable of producing more than ten megawatts of power would qualify for the published rate if the power produced during a month averaged ten megawatts.

In late 2007, Wasatch Wind Intermountain, LLC (Wasatch Wind), began investigating the feasibility of a wind power project located near Lynn, Utah, close to the Idaho-Utah border. It initially considered constructing a wind farm that would generate 150 megawatts of power, but later decided to reduce the size of the project. It desired to sell the power to Idaho Power Company (Idaho Power). On June 29, 2009, Wasatch Wind incorporated Grouse Creek Wind Park, LLC (Grouse Creek I).

3

Wasatch Wind first contacted Idaho Power in late February 2010. On February 26, 2010, Wasatch Wind sent Idaho Power an e-mail stating, "Wasatch Wind Intermountain would like to request that Idaho Power commence Power Purchase Agreement negotiations with our subsidiary, Grouse Creek Wind Park, LLC for either a 10 Average MW or something less than 80 MW Qualifying Facility under PURPA." Because the project site was outside of Idaho Power's service area, Wasatch Wind needed to find a way to connect with the Idaho Power system. Wasatch Wind stated in the e-mail, "[W]e understand that in order for you to view our project as serious and tender the Power Purchase Agreement and to make the necessary Network Service request for this Qualifying Facility, Idaho Power needs to be sure that we have the necessary transmission rights secured." The parties subsequently had various conversations and exchanged various e-mails regarding the proposed project and the requirements for obtaining a power purchase agreement and the prices at which Idaho Power would purchase the power.

Wasatch Wind planned to transmit energy to Idaho Power's Minidoka substation by connecting to a power line that was owned by the Raft River Electric Cooperative and leased to Bonneville Power Administration (BPA). Wasatch Wind had submitted the necessary applications to BPA on June 30, 2010, but to obtain approval Wasatch Wind was required to provide BPA with performance assurance of $794,376 by August 18, 2010. The projected online date was June 2012. Wasatch Wind decided not to provide the required performance assurance, and on August 19, 2010, it submitted a transmission service request to BPA with a new online date of June 2013.

During the parties' discussions, the size of the project changed. In March 2010, Wasatch Wind had requested the price at which Idaho Power would purchase energy from a 60 MW project. Ultimately, Wasatch Wind decided to reduce the size of the project to two, 10 aMW projects. On August 17, 2010, Wasatch Wind sent Idaho Power an e-mail in which Wasatch Wind stated, "First please consider this a formal request for two separate, standard, non-levelized, under-ten-average monthly-megawatt, twenty year power purchase agreements." On August 27, 2010, Wasatch Wind incorporated Grouse Creek Wind Park II, LLC (Grouse Creek II).

The parties continued negotiating and discussing the terms of a power purchase agreement. They disagreed regarding two material terms. Idaho Power required that Wasatch Wind have a firm transmission reservation with BPA to transmit power from the proposed

4

projects to Idaho Power's system and that Wasatch Wind post security for the payment of liquidated damages if the projects did not begin delivering power within 90 days of their estimated online date.

On October 1, 2010, counsel for Wasatch Wind delivered two letters to Idaho Power to clarify Wasatch Wind's position on several matters. One letter was in regard to Grouse Creek I and the other in regard to Grouse Creek II. In the letter, counsel blamed Idaho Power's unjustified actions for Wasatch Wind's decision not to post the performance assurance required by BPA and stated that Wasatch Wind had renewed its efforts with BPA. Counsel asserted that Idaho Power's requirement for delay security was unenforceable and that Wasatch Wind would not sign a purchase power agreement containing a requirement that it post any delay security unless it was required by IPUC. Counsel also stated in the letter that the size of the Grouse Creek I project was being reduced from 30 MW to 21 MW and that the size of Grouse Creek II would be 21 MW, but that they would be regulated to stay within the 10 aMW eligibility cap in order to qualify for the published rates. Finally, the letter stated that the proposed online date for both projects would be December 31, 2012. Idaho Power responded by letter dated November 1, 2010. The letter disputed various factual assertions in the October 1st letters and stated that IPUC had approved the posting of security in purchase power agreements since at least 2007. The letter also stated that because the projects were not within Idaho Power's service territory, "it is required that each project complete the interconnection process with the host utility and also secure firm transmission capacity across all required transmission paths to deliver energy to a point of delivery on the Idaho Power electrical system." Finally, the letter enclosed a generic draft purchase power agreement for Wasatch Wind to fill out and return to Idaho Power.

On November 5, 2010, Idaho Power and two other electric utilities filed a joint petition asking IPUC to investigate various avoided-cost issues and to immediately lower the eligibility for the standard avoided-cost rate from ten megawatts to 100 kilowatts. Based upon the information presented, IPUC issued an order on February 7, 2010, temporarily lowering the eligibility cap to 100 kilowatts (kW) for wind and solar qualified facilities effective on December 14, 2010, in order to further study standard avoided-cost rates for those types of facilities. IPUC's concern was that wind and solar projects that were too large to qualify for the utilities' published rate could obtain a rate that was not an accurate reflection of the utilities' actual

avoided cost by disaggregating into smaller projects, each of which would be entitled to the published rate.

On November 8, 2010, Grouse Creek I and Grouse Creek II filed complaints against Idaho Power with the IPUC seeking to establish that they had legally enforceable obligations with Idaho Power requiring it to purchase power under PURPA. On November 19, 2010, the parties met and resolved the two issues that were still in dispute. Wasatch Wind agreed to the requirement of delay security in the purchase power agreements, and Idaho Power agreed not to require a firm interconnection agreement before signing a purchase power agreement. The letter from Idaho Power memorializing the agreement concluded by asking Wasatch Wind to review the previously provided draft contracts, fill in or correct any of the required information, and return them to Idaho Power so it could generate drafts to be signed. Grouse Creek I and Grouse Creek II asked that IPUC not serve the complaints they had filed on Idaho Power because the parties were negotiating and had tentatively reached an agreement.

On December 2, 2010, Wasatch Wind submitted the proposed purchase power agreements to Idaho Power, and on December 6, 2010, it submitted additional information for Idaho Power to initiate the process of determining that Idaho Power had sufficient transmission capacity within its system for the projects. On December 7, 2010, Idaho Power sent updated draft agreements to Wasatch Wind and stated in an e-mail that one piece of key information was missing from the information provided by Wasatch Wind, which was the precise location of each project to ensure that they were at least one mile apart. On December 9, 2010, Wasatch Wind asked that the online date for both projects be extended by one year to December 2013. On December 14, 2010, Idaho Power sent an e-mail to Wasatch Wind stating that to complete the contracts it needed the name of the transmission entity and the complete legal description of the location of each project. The draft agreements submitted by Wasatch Wind on December 2, 2010 had listed PacifiCorp as the transmitting entity. On December 15, 2010, Idaho Power sent an e-mail to Wasatch Wind agreeing to the extension of the online date for both projects and asking again for the information it had requested. In an e-mail to Idaho Power later that day, Wasatch Wind provided the complete legal descriptions of the two projects and stated that BPA would be the transmission provider.

Idaho Power completed the draft purchase power agreements on December 16, 2010, and Wasatch Power picked them up the same day for its review. It signed them on December 21,

6

2010, and Idaho Power signed them on December 28, 2010 and inserted that date in the agreements as their effective dates.

Pursuant to the order issued by IPUC on February 7, 2010, the eligibility cap for the published rates for wind and solar qualified facilities was reduced to 100 kilowatts effective on December 14, 2010. The agreements provided that Idaho Power would purchase power from Grouse Creek I and Grouse Creek II according to the published rates. Both agreements included a provision stating, "This Agreement shall become finally effective upon the Commission's approval of all terms and provisions hereof without change or condition and declaration that all payments to be made to Seller hereunder shall be allowed as prudently incurred expenses for ratemaking purposes."

On December 29, 2010, Idaho Power filed applications with IPUC requesting acceptance or rejection of the agreements. On February 24, 2011, IPUC issued a written notice permitting interested persons to file comments by March 24, 2011. On that date, Grouse Creek I and Grouse Creek II filed motions to intervene and written comments supporting approval of the agreements. IPUC denied the motions to intervene on the ground that the motions were unnecessary because Grouse Creek I and Grouse Creek II were parties to the agreements. As parties to the agreements, they were interested persons who could file comments without intervening. On June 8, 2011, IPUC issued its order disapproving the two purchase power agreements because the agreements were signed and included effective dates after December 14, 2010. The projects did not qualify for the published rates because they were no longer within the eligibility cap.

On June 29, 2011, Grouse Creek I and Grouse Creek II filed a joint petition for reconsideration. They argued that they were entitled to the published rate that was in effect prior to December 14 for several reasons including that they had legally enforceable obligations with Idaho Power prior to that date even if the contracts were not executed until after that date. IPUC held that the parties executed contracts stating that their effective dates were December 28, 2010, and that was the date upon which they had a legally enforceable obligation.

Grouse Creek I and Grouse Creek II timely appealed. While the appeal was pending, FERC issued a declaratory order involving Cedar Creek Wind, LLC, which had entered into agreements with another electric utility in Idaho. Under the agreements, each of five wind projects would sell electricity to the utility using the 10 aMW non-levelized published avoided-

cost rates. Cedar Creek Wind signed the agreements on December 13, 2010, and on the same date it returned them to the utility for its signature. The utility did not sign them until December 22, 2010, after the effective date on which the eligibility cap for published rates was lowered to 100 kilowatts for wind and solar projects. IPUC disapproved the agreements, holding that they did not become effective until signed by both parties and that they were therefore not eligible for the published rates in existence before December 14, 2010. Cedar Creek Wind sought a declaratory order from FERC, and it issued an order stating that IPUC erred by not considering that a legally enforceable obligation could have been created before the utility signed the contracts. In its order, FERC interpreted IPUC as holding that "a legally enforceable obligation can result from only a fully-executed contract."

At the request of all parties, we suspended the appeal and remanded this case back to IPUC to reconsider its decision in light of the declaratory order in the Cedar Creek Wind case. On remand, IPUC solicited additional briefing from the parties and held oral argument on the matter. On September 7, 2012, it issued its order again refusing to approve the power purchase agreements because the rates in them were no longer available as published rates when the contracts were executed and became effective.

In reaching its decision, IPUC stated that it "did not and has never made a determination that the creation of a legally enforceable obligation only occurs when a QF [qualified facility] and a utility enter into a written and signed agreement." It noted that it had previously ruled that a qualified facility could obtain an avoided cost rate: "(1) by entering into a signed contract with the utility; or (2) by filing a meritorious complaint alleging that a 'legally enforceable obligation' has arisen and, but for the conduct of the utility, there would be a contract." It held that where Grouse Creek I and Grouse Creek II had negotiated agreements with Idaho Power that specifically set forth the terms and conditions of the agreements, including their effective date, IPUC "recognized and chose to enforce the terms of the Agreements that the parties entered into voluntarily." Even assuming that a legally enforceable obligation could preempt the terms of the parties' written and signed agreements, IPUC found that there was no legally enforceable obligation prior to December 14, 2010. Finally, IPUC "determined that it was not in the public interest to approve the Agreements [because] . . . 'allowing a project to avail itself of an eligibility cap (and therefore published rates) that is no longer applicable could cause ratepayers

8

to pay more than the utility's avoided cost.' " Grouse Creek I and Grouse Creek II then filed an amended notice of appeal to this Court.

## II.
## Standard of Review.

Article 5, § 9, of the Idaho Constitution grants to this Court jurisdiction to review on appeal any order of the public utilities commission, and it grants to the legislature the authority to "provide conditions of appeal, scope of appeal, and procedure on appeal from orders of the public utilities commission." Pursuant to that authority, the legislature has enacted Idaho Code section 61-629 which limits the scope of review to determining "whether the commission has regularly pursued its authority, including a determination of whether the order appealed from violates any right of the appellant under the constitution of the United States or of the state of Idaho."

## III.
## Did IPUC Err in Failing to Find that Grouse Creek I and Grouse Creek II Had Legally Enforceable Obligations Prior to December 14, 2010?

State agencies that regulate electric utilities are required to implement FERC rules, but they have discretion in determining the manner in which the rules will be implemented, and they may comply by issuing regulations, by resolving disputes on a case-by-case basis, or by other action reasonably designed to give effect to FERC's rules. *F.E.R.C.*, 456 U.S. at 751. "[S]tates must provide for legally enforceable obligations as distinct from contractual obligations, but '[i]t is up to the States, not [FERC], to determine the specific parameters of individual QF power purchase agreements, including the date at which a legally enforceable obligation is incurred under State law.' " *Power Resource Group, Inc. v. Public Utility Comm'n of Texas*, 422 F.3d 231, 238 (5th Cir. 2005); *accord Rosebud Enterprises, Inc. v. Idaho Public Utilities Comm'n*, 128 Idaho 609, 623-24, 917 P.2d 766, 780-81 (1996) (*Rosebud Enterprises I*). "FERC has given each state the authority to decide when a LEO [legally enforceable obligation] arises in that state." *Power Resource Group*, 422 F.2d at 239.

On August 22, 1990, in a proceeding commenced by A.W. Brown Company, Inc., IPUC issued an order setting forth requirements for a legally enforceable obligation. IPUC had lowered the published rates and had issued an order stating that regulated utilities were entitled

9

to the higher rates that had been in effect if they either had a signed contract with the electric utility for the higher rates or had filed a meritorious complaint with IPUC on or before April 29, 1985. To prevail on the meritorious complaint, the qualified facility must show that but for the actions of the electric utility, the qualified utility was otherwise entitled to a contract. IPUC held that A.W. Brown Company was not entitled to the higher rate, and the company appealed.

On appeal, we identified the issue as whether IPUC had the authority to establish a requirement that "before a [qualified facility] can lock-in a certain rate, there must be a signed contract to sell at that rate or a meritorious complaint alleging that the project was mature and that the developer had attempted, and failed, to negotiate a contract with the utility." *A.W. Brown Co., Inc. v. Idaho Power Co.*, 121 Idaho 812, 815, 828 P.2d 841, 844 (1992). We held that IPUC did not err in ruling that the company did not comply with IPUC's regulatory scheme to qualify for the higher rates. *Id.* at 818, 828 P.2d at 847.

Later, in *Rosebud Enterprises, Inc. v. Idaho Public Utilities Comm'n*, 131 Idaho 1, 951 P.2d 521 (1997), we affirmed the holding in *A.W. Brown* and held that it was consistent with state and federal law. We stated:

> In *A.W. Brown Co.*, this Court ruled that IPUC has authority, under state and federal law, to require that before a developer can lock in a certain rate, there must be either a signed contract to sell at that rate or a meritorious complaint alleging that the project is mature and that the developer has attempted and failed to negotiate a contract with the utility; that is, there would be a contract but for the conduct of the utility. Rosebud has neither signed a contract nor established that Idaho Power will not negotiate with it.

*Id.* at 6, 951 P.2d at 526 (citation omitted).

In its order issued in the proceeding involving *A.W. Brown Co.*, IPUC correctly noted: "The concept of 'legally enforceable obligation' does not appear in PURPA. Rather, it arises from the implementing regulations promulgated by the Federal Energy Regulatory Commission." IPUC then quoted FERC's explanation for adopting that concept in its regulations. "Use of the term 'legally enforceable obligation' is intended to prevent a utility from circumventing the requirement that provides capacity credit for an eligible qualifying facility merely by refusing to enter into a contract with the qualifying facility." 45 Fed. Reg. 12214, 12224 (February 25, 1980).

"FERC has given each state the authority to decide when a LEO [legally enforceable obligation] arises in that state." *Power Resource Group*, 422 F.3d at 239. In that case, the court

10

upheld an order from the state public utilities commission that "a legally enforceable obligation arises only when a qualified facility can deliver power within 90 days." *Id*. at 237. The court added, "If FERC had determined it necessary to set more specific guidelines concerning LEOs, it could have done so." *Id*. at 239. Considering FERC's declared purpose for adopting the concept of a legally enforceable obligation and the broad discretion that IPUC has in implementing FERC's rules and in determining the requirements for a legally enforceable obligation, we again affirm IPUC's requirement that a finding of a legally enforceable obligation requires a showing that there would have been a contract but for the actions of the utility.

In this case, IPUC found that Idaho Power was not at fault for the failure to have a written contract sooner than December 14, 2010, IPUC specifically found:

> The utility did not refuse to sign a contract. In fact, ongoing negotiations led to the parties' voluntarily entering into two subsequent PPAs [power purchase agreements]. Grouse Creek never initiated a complaint process because Agreements were negotiated and Grouse Creek urged the Commission to approve the terms of the Agreements. We find that no conduct by the utility unnecessarily delayed or impeded Grouse Creek's ability to enter into its Agreements. Because the utility did not impede Grouse Creek's ability to enter into PPAs, a determination regarding a legally enforceable obligation was never triggered.

We must uphold IPUC's findings of fact if they are supported by substantial, competent evidence in the record. *Rosebud Enterprises I*, 128 Idaho at 618, 917 P.2d at 775. These findings are not challenged on appeal.

Grouse Creek I and Grouse Creek II argue at length that they had legally enforceable obligations with Idaho Power prior to December 14, 2010. Because the parties voluntarily negotiated their purchase power agreements, which provided that the effective dates were December 28, 2010, whether there could have been a legally enforceable obligation prior to entering into those agreements is irrelevant under the rule adopted by IPUC. In addition, each contract included a provision stating, "This Agreement constitutes the entire Agreement of the Parties concerning the subject matter hereof and supersedes all prior or contemporaneous ora1 or written agreements between the Parties concerning the subject matter hereof."

## IV.
### Was IPUC's Refusal to Approve the Power Purchase Agreements Arbitrary and Capricious?

11

Grouse Creek I and Grouse Creek II argue that IPUC's decision not to approve their purchase power agreements was arbitrary and capricious because it had in other cases previously allowed qualified facilities to purchase power at rates that were no longer applicable to those facilities. They raised this issue on their motion for reconsideration, and IPUC explained its reasoning. The purchase power agreements contained effective dates of December 28, 2010. Because this Court had previously noted that regulatory agencies perform judicial and legislative functions and are therefore not bound by *stare decisis*, IPUC was not bound by its prior grandfathering treatment. Finally, allowing Grouse Creek I and Grouse Creek II to sell power at the rates to which they would have been entitled prior to December 14, 2010, would not have been in the public interest.

IPUC's decision to lower the eligibility cap for wind and solar projects was based upon its concern that large wind and solar projects that did not qualify for the published rates could disaggregate in order to qualify for the published rates and thereby obtain rates that did not accurately reflect the utilities' actual avoided cost. FERC rules require that rates for purchasing electric power shall "[b]e just and reasonable to the electric consumer of the electric utility and in the public interest." 18 CFR § 292.304(a)(1)(i). As stated above, qualified utilities that are larger than the eligibility cap for published rates must have their purchase rates determined on a case-by-case basis. During oral argument, Grouse Creek I and Grouse Creek II conceded that they would not have appealed but for the concern that the avoided cost rates if actually calculated for these two projects would be less than the published rates. Thus, allowing them to sell power at the published rates would result in Idaho Power being required to purchase their power at more than its actual avoided costs. Requiring Idaho Power to do so would require it to purchase power at rates that are not just and reasonable to its electric consumers and would be contrary to the public interest. IPUC's decision to disapprove of the purchase power agreements in this case was not arbitrary and capricious.

Grouse Creek I and Grouse Creek II cite at length from declaratory orders issued by FERC, and they argue that we must give deference to the interpretations of FERC rules contained in those orders. The relevance of FERC orders was explained by the District of Columbia Circuit Court of Appeals in *Industrial Cogenerators v. F.E.R.C.*, 47 F.3d 1231 (1995), as follows:

Except that a private party bringing an enforcement action in district court might seek to introduce the Declaratory Order in order to show that the FERC supported its position, the Order was of no legal moment. . . . Unlike the declaratory order of a court, which does fix the rights of the parties, this Declaratory Order merely advised the parties of the Commission's position. It was much like a memorandum of law prepared by the FERC staff in anticipation of a possible enforcement action; the only difference is that the Commission itself formally used the document as its own statement of position. While such knowledge of the FERC's position might affect the conduct of the parties, the Declaratory Order is legally ineffectual apart from its ability to persuade (or to command the deference of) a court that might later have been called upon to interpret the Act and the agency's regulations in an private enforcement action . . . .

*Id*. at 1234-35.

## V.
## Was IPUC Required to Approve the Rates Set Forth in the Purchase Power Agreements?

Grouse Creek I and Grouse Creek II argue that 18 CFR § 292.301(b) required IPUC to approve the rates set forth in the purchase power agreements. That rule states:

(b) Negotiated rates or terms. Nothing in this subpart:
   (1) Limits the authority of any electric utility or any qualifying facility to agree to a rate for any purchase, or terms or conditions relating to any purchase, which differ from the rate or terms or conditions which would otherwise be required by this subpart; or
   (2) Affects the validity of any contract entered into between a qualifying facility and an electric utility for any purchase.

Grouse Creek I and Grouse Creek II contend that the above-quoted rule requires IPUC to honor any rates negotiated between an electric utility and a qualified facility. That argument is contrary to 18 CFR § 292.304(a) which provides:

(a) Rates for purchases. (1) Rates for purchases shall:
   (i) Be just and reasonable to the electric consumer of the electric utility and in the public interest; and
   (ii) Not discriminate against qualifying cogeneration and small power production facilities.
(2) Nothing in this subpart requires any electric utility to pay more than the avoided costs for purchases.

PURPA does not provide that FERC shall become the nationwide public utilities commission. Any rates at which electric utilities can purchase power must be approved by IPUC. Indeed, both of the parties' contracts expressly provided, "This Agreement shall become finally effective upon the Commission's approval of all terms and provisions hereof without

13

change or condition and declaration that all payments to be made to Seller hereunder shall be allowed as prudently incurred expenses for ratemaking purposes." It is clear that IPUC was not required to accept whatever rates were set forth in the purchase power agreements.

## VI.
## Are Grouse Creek I and Grouse Creek II Entitled to an Award of Attorney Fees on Appeal Pursuant to Idaho Code § 12-121?

Grouse Creek I and Grouse Creek II request an award of attorney fees under Idaho Code section 12-121. That statute provides, "In any civil action, the judge may award reasonable attorney's fees to the prevailing party or parties . . . ." That statute has no application to this case. It only applies in "any civil action," which is an action by filing a complaint in court as required by Rule 3(a) of the Idaho Rules of Civil Procedure. *Lowery v. Bd. of Cnty. Comm'rs for Ada Cnty.*, 117 Idaho 1079, 1082, 793 P.2d 1251, 1254 (1990). An appeal from an agency decision is not a civil action. *Allen v. Blaine Cnty.*, 131 Idaho 138, 142, 953 P.2d 578, 582 (1998).

## VII.
## Conclusion.

We affirm the order of the IPUC and award costs on appeal to respondents.


Chief Justice BURDICK, Justice HORTON**,** and J. Pro Tem KIDWELL **CONCUR.**


J. JONES, Justice, concurring in the result.

I concur in the result reached by the IPUC and affirmed by the Court. However, I am uncomfortable with the route taken by the IPUC in reaching its final resolution of this case, as the three orders issued by the IPUC are somewhat unclear, and rather in conflict, as to the elements of a legally enforceable obligation (LEO) and how a qualifying facility (QF) may obtain grandfathering status. Because these issues are of vital importance to both utilities and QFs, it is essential that they have understandable and predictable criteria for their planning and contracting activities. That is not what occurred in these proceedings.

The parties entered into two contracts, each specifically stating the effective date to be December 28, 2010. Idaho Power signed the contracts on that date. The IPUC held that that was

the date upon which the parties had a legally enforceable obligation because it was the date the contracts were fully executed. The IPUC disapproved the contracts, holding that they did not become effective until signed by both parties and that because the projects exceeded the eligibility cap established as of December 14, 2010, Grouse Creek was not eligible for the rates provided for in the contracts.

The IPUC correctly characterized the contracts as LEOs and had a basis for determining that December 28 was their effective date. Grouse Creek is unhappy that Idaho Power inserted the December 28, 2010 effective date into the contracts after Grouse Creek had signed them. At oral argument, Grouse Creek's counsel indicated that this was in keeping with Idaho Power's usual practice. However, Grouse Creek was aware of the IPUC proceedings pertaining to the eligibility cap and that any decision on lowering the cap would be effective as of December 14, 2010. The contracts were specifically subject to, and conditioned upon, IPUC approval of the entirety of their provisions. If Grouse Creek had concerns that the effective date inserted into the contracts would be determinative of its rights, it could have inserted a different effective date into the contracts instead of leaving it to Idaho Power to do so. Grouse Creek has made no claim of fraud or other grounds for avoidance of the December 28 effective date.

Rather than simply stating that Grouse Creek could not pursue a non-contractual LEO theory, since it had voluntarily entered into a contractual LEO with Idaho Power, the IPUC addressed the issue of whether an LEO had arisen prior to December 28. In doing so, the IPUC relied upon the integration clause in the contracts. In its final order, Order No. 32635, issued on September 7, 2012, the IPUC stated:

> Because the parties have existing contracts, and we find no undue or unreasonable delay on the part of Idaho Power, a determination of the existence of a legally enforceable obligation at another point in time is unnecessary. Moreover, the parties agreed that all prior agreements were superseded by the December 28, 2010 PPAs. Here the Commission did not have to determine whether a legally enforceable obligation arose because the parties entered into written Agreements. . . . We also find that the Agreements expressly supersede all prior agreements, including any entitlement to an otherwise enforceable legal obligation.

*Id*. at 16−17. The problem with these holdings is that the parties did not have "existing contracts."

What the IPUC failed to take into account in relying on the December 28 contracts is the fact that both contracts were contingent upon a condition precedent[1]:

> This Agreement shall become finally effective upon the Commission's approval of all terms and provisions hereof without change or condition and declaration that all payments to be made to [Grouse Creek] hereunder shall be allowed as prudently incurred expenses for ratemaking purposes.

This condition was not fulfilled because the IPUC disapproved the contracts and they thus became null and void. The IPUC cannot disapprove the contracts, thereby invalidating them pursuant to their express terms, and then rely on them to rule against a contracting party.

Furthermore, the integration clause in the contracts does not negate the existence of a non-contractual LEO. That provision reads:

> This Agreement constitutes the entire Agreement of the Parties concerning the subject matter hereof and supersedes all prior or contemporaneous oral or written agreements between the Parties concerning the subject matter hereof.

This provision, like all of the other provisions in the contracts, became superfluous and of no force or effect upon failure of the condition precedent. Where the parties specifically agreed that the IPUC must approve all terms and provisions of the contract without change or condition, the IPUC does not have the ability to selectively enforce any provision of the contracts against any contracting party. Of more importance is the fact that the integration clause only pertains to oral or written agreements. It does not extend beyond "agreements" to include negotiations, representations, and the like. An LEO is not always an agreement, as the IPUC appears to have assumed. An LEO, by its very nature, is usually something less than an oral or written agreement. It can be established by a "meritorious complaint alleging that the project is mature and that the developer has attempted and failed to negotiate a contract with the utility." *Rosebud Enterprises, Inc. v. Idaho Public Utilities Comm'n* (*Rosebud II*), 131 Idaho 1, 6, 951 P.2d 521, 526 (1997). A contract or agreement is a variety of LEO but an LEO is not always a contract or agreement.

---

[1] We stated in *Weisel v. Beaver Springs Owners Ass'n, Inc.*:

> A condition precedent is an event not certain to occur, but which must occur, before performance under a contract becomes due. . . .When there is a failure of a condition precedent through no fault of the parties, no liability or duty to perform arises under the contact.

152 Idaho 519, 528, 272 P.3d 491, 500 (2012).

16

An LEO is a somewhat amorphous product of a combination of federal and state laws based on PURPA. Although states must implement PURPA pursuant to FERC regulations, "FERC has adopted regulations . . . [that] afford state regulatory authorities . . . latitude in determining the manner in which the regulations are to be implemented." *F.E.R.C. v. Mississippi*, 456 U.S. 742, 751 (1982). This latitude extends to the way in which legally enforceable obligations are created. In *Rosebud Enterprises, Inc. v. Idaho Public Utilities Comm'n* (*Rosebud I*), 128 Idaho 609, 623−24, 917 P.2d 766, 780–81 (1996) (quoting *West Penn Power Co.*, 71 FERC ¶ 61,153 (1995)), the Court noted that, according to FERC, "'[i]t is up to the States,'" not FERC, "'to determine the specific parameters of individual QF power purchase agreements, including the date at which a legally enforceable obligation is incurred under State law.'"

A state's latitude, however, has limits. FERC provides that a QF may provide energy to a utility either by entering into a contract or through a legally enforceable obligation. 18 C.F.R. § 292.304(d). In implementing PURPA, "states must provide for legally enforceable obligations as distinct from contractual obligations . . . ." *Power Resource Group, Inc. v. Public Utilities Comm'n of Texas*, 422 F.3d 231, 238 (5ᵗʰ Cir. 2005). FERC explains that "[t]his option to sell via legally enforceable obligation was 'specifically adopted to prevent utilities from circumventing the requirement of PURPA that utilities purchase energy and capacity from QFs.'" *Grouse Creek Wind Park, LLC*, 142 FERC ¶ 61187 at P 40 (citing *Cedar Creek*, 137 FERC ¶ 61006 at P 32).[2] FERC explained:

> [Grouse Creek is] thus entitled to a legally enforceable obligation in those situations where, for example, a utility has refused to negotiate a contract. In order to protect the rights of a QF, once a QF makes itself available to sell to a utility, a legally enforceable obligation may exist prior to the formation of a contract. A contract serves to limit and/or define bilaterally the specifics of the relationship between the QF and the utility. A contract may also limit and/or define bilaterally the specifics of the legally enforceable obligation at the heart of that relationship. But the obligation can pre-date the signing of the contract. Moreover, the tool of

---

[2] Although a FERC declaratory order does not "fix the rights of the parties," it does "advise the parties of the Commission's position." *Indus. Cogenerators*, 47 F.3d at 1235. A FERC declaratory order is "much like a memorandum of law prepared by the FERC staff in anticipation of a possible enforcement action," and is also "formally used" by FERC "as its own statement of position." *Id.* As a general rule, courts defer to an agency's interpretation of its own regulations unless the interpretation is "plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997). For example, in the recent *Decker v. Northwest Environmental Defense Center*, the Supreme Court proclaimed it "well established that an agency's interpretation need not be the only possible reading of a regulation—or even the best one—to prevail." 133 S.Ct. 1326, 1337 (2013). Because FERC's declaratory orders interpret its own regulations, they are not binding on this Court but do offer persuasive authority and are entitled to deference.

> "seek[ing] state regulatory authority assistance to enforce the PURPA-imposed obligation" does not mean that seeking such assistance is a necessary condition precedent to the existence of a legally enforceable obligation.

*Id.*

FERC stated that the IPUC's "limitation on the conditions for legally enforceable obligation formation overlooked 'the fact that a legally enforceable obligation may be incurred before the formal memorialization of a contract to writing.'" *Id.* at P 36 (citing *Cedar Creek*, 137 FERC ¶ 61,006 at P 36). FERC noted that its regulations "expressly use the terms 'contract' and 'legally enforceable obligation' in the disjunctive to demonstrate that a legally enforceable obligation includes, but is not limited to, a contract." *Cedar Creek*, 137 FERC ¶ 61,006 at P 35. Indeed, an LEO may be formed unilaterally, through the actions of a QF. FERC indicated in *Cedar Creek*, that a QF creates an LEO "by committing itself to sell to an electric utility," because this commitment by the QF "also commits the electric utility to buy." 137 FERC ¶ 61,006 at P 32.

Language in the IPUC orders creates confusion as to what is required to establish an LEO. In Order No. 32257, the IPUC stated that it "does not consider a utility and its ratepayers obligated until both parties have completed their final reviews and signed the agreement." *Id.* at 9. In its order on reconsideration, Order No. 32299, the IPUC found that "a legally enforceable obligation is incurred and a contract is fully executed upon the signature of both parties." *Id.* at 8. These statements suggest the IPUC failed to recognize that a utility may be obligated to purchase a QF's energy even if it does not agree to the terms of a QF's commitment to sell to it. FERC explicitly stated that "the phrase legally enforceable obligation is broader than simply a contract between an electric utility and a QF," because "the phrase is used to prevent an electric utility from avoiding its PURPA obligations by refusing to sign a contract, or . . . delaying the signing of a contract, so that a later and lower avoided cost is applicable." *Cedar Creek*, 137 FERC ¶ 61,006 at P 32. However, the IPUC then corrected these statements in its final order, Order No. 32635, by stating:

> We have a long history of recognizing two methods by which a QF can obtain an avoided cost rate in Idaho: (1) by entering into a signed contract with the utility; or (2) by filing a meritorious complaint alleging that 'a legally enforceable obligation' has risen and, but for the conduct of the utility, there would be a contract.

*Id.* at 12 (citing *Rosebud II* and *A.W. Brown v. Idaho Power Co.*, 121 Idaho 812, 816, 828 P.2d 841, 845 (1992)). The IPUC went on to state that its "application of this framework conforms with FERC's analysis of its standards," stating those standards to be:

> Thus, under our regulations, a QF has the option to commit itself to sell all or part of its electric output to an electric utility. *While this may be done through a contract, if the electric utility refuses to sign a contract*, the QF may seek state regulatory authority assistance to enforce the PURPA-imposed obligation on the electric utility to purchase from the QF, and *a non-contractual, but still legally enforceable, obligation will be created pursuant to the state's implementation of PURPA.* Accordingly, a QF, by committing itself to sell to an electric utility, also commits the electric utility to buy from the QF; *these commitments result either in contracts or in non-contractual, but binding, legally enforceable obligations.*

*Id.* at 12−13 (quoting *JD Wind 1*, 129 FERC ¶ 61,148 at 61,633). The IPUC continued:

> Either the parties enter into a contract or, if the utility is failing to negotiate or refusing to enter into a contract with a QF, the QF can file a complaint with this Commission, at which time the Commission will make a determination as to whether and when a legally enforceable obligation arose.

*Id.* at 13. Then, the Commission said what it should have said in the very first instance, "[w]hen a contract has been entered into by the parties and submitted for approval, there is no need for a determination regarding any other legally enforceable obligation." *Id.* Had the IPUC said exactly that in its first order, rather than appearing to equate an LEO with a contract and requiring a signature for both, the confusion created by its first two orders might have been averted.

An LEO is a significant protection for a QF that is dealing with an intransigent electric utility. By committing itself to sell its output to an electric utility, a QF has an alternate non-contractual route to pursue. It does not require signatures or all of the attendant features of a contract. However, where the utility does agree to terms acceptable to the QF, the alternate route is not necessary. It may well be that Grouse Creek's filing of the complaints against Idaho Power on November 8, 2010, jump-started the negotiations that produced the contracts. Once voluntary contracts were entered into by the parties, the non-contractual LEO alternative was no longer necessary for, or available to, Grouse Creek. It had an actual LEO. Unfortunately for Grouse Creek, it had voluntarily agreed to terms that turned out not to be to its advantage. By ceding to Idaho Power the ability to establish the effective date of the contracts, and knowing of the ongoing proceeding where the IPUC had notified interested parties that a change in the eligibility cap was under consideration and would be effective as of December 14, 2010, Grouse Creek was clearly taking a gamble—one which it lost.

19

Unfortunately, after hitting the nail on the head, the IPUC went on to find "that a legally enforceable obligation did not arise prior to December 14, 2010, because material terms of the Agreements were still incomplete on that date," and "that the Agreements expressly supersede all prior agreements." Again, these statements seem to imply that an LEO is necessarily a contract, entailing all of the elements of a contract. Order No. 32635 at 16 and 17. There was no need to insert this superfluous, confusing language into the order.

Grouse Creek also claims that the IPUC acted in an arbitrary and capricious manner by failing to grandfather its projects, pointing out that the IPUC's action was inconsistent with previous grandfathering decisions. The three orders filed by the IPUC do appear to be inconsistent with the grandfathering criteria it laid out in 2005, when, as in this case, it was in the process of lowering the posted rate eligibility cap. *In the Matter of Suspending Idaho Power's PURPA Obligation*, Case No. IPC-E-05-22. In that proceeding, the Commission found it "reasonable to establish [certain] criteria to determine the eligibility of PURPA qualifying wind generating facilities for contracts at the published avoided cost rates." Order No. 29839 at 9. The criteria were:

> (1) [S]ubmittal of a signed power purchase agreement to the utility, or (2) submittal to the utility of a completed Application for Interconnection Study and payment of fee. In addition to a finding of existence of one or both of the preceding threshold criteria, the QF must also be able to demonstrate other indicia of substantial progress and project maturity, e.g., (1) a wind study demonstrating a viable site for the project, (2) a signed contract for wind turbines, (3) arranged financing for the project, and/or (4) related progress on the facility permitting and licensing path.

*Id.* at 10. The IPUC later affirmed this grandfathering criteria, noting that it developed the requirements "to recognize and not discount the considerable time, effort and energy expended by some QFs in developing their projects . . . ." Order No. 29872 at 10.

An examination of some of the IPUC's past decisions citing Order Nos. 29829 and 29872 demonstrates a lack of consistency. In *Salmon Falls*, a case decided after the 2005 change in posted rate eligibility, Idaho Power and a QF submitted an agreement for approval and sought grandfathering. Order No. 29951. The Commission found that the "Firm Energy Sales Agreement" presented by Idaho Power was acceptable because the "project satisfie[d] the grandfathering eligibility criteria established in Order Nos. 29839 and 29872 in Case No. IPC-E-05-22." *Id.* at 5. The IPUC noted that "the Agreement will not become effective until the

Commission has approved all the Agreement's terms and conditions . . . ." Order No. 29951 at 2. Notably, the Commission made no mention of the agreement's effective date.

In *Yellowstone Power*, a QF and Idaho Power submitted an agreement, dated July 28, 2010, to the IPUC for approval, but maintained that the QF was entitled to avoided cost rates that had changed on March 16, 2010. Order No. 32104. In that case, there was no "contract to purchase the QF generation on or before March 16, 2010, nor had Yellowstone filed a complaint alleging that Idaho Power acted unreasonably or in bad faith by not signing an agreement before March 16 when the rates changed." *Id.* at 3. Furthermore, the record did not reveal "any documentation" to indicate "that there was a meeting of the minds prior to March 16, 2010." *Id.* at 6. Despite these irregularities, the IPUC nonetheless approved the agreement as submitted, granting the QF grandfathered status and entitlement to the rates published prior to March 16. *Id.* at 12. Here, too, the IPUC noted that "[b]y its own terms, the Agreement will not become effective until the Commission has approved all of the Agreement's terms and conditions and declares that all payments made by Idaho Power to [the QF] for purchases of energy will be allowed as prudently incurred expenses for ratemaking purposes." Order No. 32104 at 5.

In *Cargill*, Idaho Power sought grandfathering for a QF, arguing that "all outstanding contract issues had been resolved . . . and that but for the internal review process of [Idaho Power] a contract would have been signed" prior to the rate change. Order No. 32024 at 4. Although the QF had not filed a complaint with the IPUC as required by *A.W. Brown*, "by signing the Agreement and voluntarily presenting it to the Commission, Idaho Power has nevertheless concluded that [the QF] meets the second test of the Commission and should be entitled" to grandfathering. *Id.* at 2. The IPUC Staff offered its opinion "that the grandfathering criteria developed and applied by Idaho Power in this case are fair and reasonable." *Id.* at 3. The IPUC again noted that the "Agreement will not become effective until the Commission has approved all of the Agreement's terms and conditions . . . ." Order No. 32024 at 3. With little discussion, the IPUC granted grandfathering to the QF, stating that Idaho Power "fairly represented" IPUC's "past grandfathering requirements" and, citing *A.W. Brown*, stated that Idaho Power's "approach in this case regarding contract rates" was "in concert with the spirit of those prior grandfathering cases." *Id.* at 4. Grandfathering, of course, is not the province of Idaho Power, but instead "is essentially an IPUC finding that a legally enforceable obligation to sell power existed at a given date." *Rosebud I*, 128 Idaho at 624, 917 P.2d at 781.

21

The IPUC, as a regulatory body, may depart from its previous decisions regarding grandfathering. "Because regulatory bodies perform legislative as well as judicial functions in their proceedings, they are not so rigorously bound by the doctrine of *stare decisis* that they must decide all future cases in the same way as they have decided similar cases in the past." *Id.* at 618, 917 P.2d at 775. Indeed, "[b]ecause each case presents a myriad of facts that distinguish it, no one case represents the law by which subsequent parties are bound." *Id.* at 615, 917 P.2d at 772. Nonetheless, the IPUC must "demonstrate that it has applied the criteria prescribed by statute and by its own regulations and has not acted arbitrarily or on an *ad hoc* basis . . . ." *Washington Water Power v. Idaho Public Utilities Comm'n*, 101 Idaho 567, 575, 617 P.2d 1242, 1250 (1980) (quoting *Home Plate, Inc. v. OLCC*, 20 Or. App. 188, 190, 530 P.2d 862, 863 (1975)). Here, with little explanation, the IPUC appears to have departed from its own line of orders on grandfathering and seemingly created new criteria applicable to Grouse Creek alone—determining the grandfathering issue on the basis of when the contracts were fully executed.

In Order No. 32257, the IPUC indicates that grandfathering applies only to changes in rates and not eligibility size. *Id.* at 10. Then, in Order No. 32299, the IPUC seems to imply that the grandfathering concept applies to both. Order No. 32635 does not specifically address grandfathering criteria but it clearly appears that the Commission declined to grandfather the Grouse Creek contracts because those contracts were not signed by both parties until December 28, 2010. *Id.* at 16–17. No mention is made of the various holdings that an agreement does not become effective until the IPUC has approved all of its terms and conditions. Nor does the IPUC indicate what might have happened if the parties had agreed to an effective date prior to December 14, even though the contracts were actually signed after that date. In other words, it remains an open question as to whether the IPUC would still refuse to grandfather if the parties selected an effective date prior to the change in rates or eligibility but after the contracts were signed by both parties. And, in the case where a non-contractual LEO is found to exist, where neither party may have signed the contract, it is not clear whether the IPUC would apply the criteria set out in Order No. 29839.

As noted above, the IPUC may change its criteria regarding grandfathering but, if it does so, it should demonstrate that it is not acting arbitrarily or in an *ad hoc* manner. Here, the IPUC has provided little explanation for its departure from the grandfathering criteria stated in Order

22

No. 29839 and subsequent orders. It primarily hangs its hat on the December 28, 2010 effective date of the contracts and finds that "[t]he rates in the Agreements, as written, do not comply with Commission Order No. 32176." This reference to the order changing the eligibility cap is minimal support for the change but probably sufficient to satisfy the need for explanation since Order No. 32176 does contain discussion, policy considerations, and a policy determination regarding the eligibility cap.

It is not the intent hereof to be overly critical of the IPUC because it and its members are conscientious and provide good public service. The orders in this case have the potential, however, of creating confusion on two important issues—the criteria for establishing a non-contractual LEO and for qualifying for grandfather status. Careful wording is essential to eliminate confusion and provide predictability for interested parties.